# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CA-01005-SCT

*JAMES ALLEN MORTON*

*v.*

*JOLENE ANSEMAN*

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-A**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/29/94 |
| TRIAL JUDGE: | HON. MELVIN MCCLURE |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ROBERT G. ROY |
| ATTORNEY FOR APPELLEE: | MICHAEL R. WALL |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 5/29/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/19/97 |

**BEFORE SULLIVAN, P.J., PITTMAN AND BANKS, JJ.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

## STATEMENT OF THE FACTS

After dating for one or two years, Jolene Anseman and James Morton were married on September 16, 1978. Jolene was pregnant, and at the time of the marriage was having sexual relations with James, Troy Bourque, and Randy LeFleur. James knew that Jolene was pregnant when they married, and while Jolene never told James about the paternity of the child, James understood that he was the father. He testified that he would not have married Jolene had he known that the baby was not his or that Jolene had been having sexual relations with other men. Troy Bourque testified that Jolene told him that he was the child's father, but that Jolene did not tell James. Jolene testified that she told Troy that the child was James's and that she never told James that the child was not his. The child, Brandon Morton, was born on April 24, 1979. Three months later, James's brother told him that Brandon was not James's son. James testified that the first knowledge he had of Jolene's relationship with Troy Bourque was in the summer of 1991 when Brandon told him that Jolene had taken him to visit his "real father." James testified that he still believed that Brandon was his son until blood tests

conducted in December of 1993 revealed that neither James nor Troy was Brandon's father.

On March 25, 1981, Jolene gave birth to another son, Josh. A DNA test conducted in December of 1993 revealed that neither James nor Troy Bourque was Josh's father. Jolene testified that Timothy Drew Robinson was Josh's father, but no blood test had been conducted to determine this fact. Again, James testified that although he suspected that Jolene was not faithful to him, he believed Jolene when she told him that both Brandon and Josh were his sons until the blood tests were conducted in 1993. James is named as the father on both Brandon's and Josh's birth certificates, and he always treated the boys as if they were his own and held himself out to be their father.

Jolene and James were divorced on January 12, 1984, upon grounds of irreconcilable differences, and James was required under the divorce decree to pay Jolene $200 per month in child support. On July 14, 1986, Jolene filed a petition for citation of contempt against James for failure to keep up the child support payments. The chancellor held James in contempt and ordered him to pay the arrearage and attorneys' fees, totaling $2,400 plus court costs. After the contempt proceedings, Brandon and Josh, and sometimes Jolene, would live with James for periods of time, although testimony differed as to the dates and lengths of stays. James testified that while Jolene lived with him they agreed that he would pay her monthly car note in the amount of $153.43 and the $2,000 down payment in lieu of child support payments. James's mother testified that James would send her the money for the car payments and that she would pay the bank. Jolene testified that she paid the $2,000 car down payment, that she and James made car payments together, and that James was required in their separation agreement to assist her in buying a car. In fact, the separation agreement stated that James would make one-half of Jolene's monthly car payments.

On July 13, 1993, Jolene filed another petition for citation of contempt claiming that James owed her $13,000 in back child support payments, because he had not made a payment since January of 1988. That left a total of $16,000 unpaid at the time of trial. The petition for citation of contempt was consolidated with James's complaint for annulment and motion for relief from the divorce judgment. Based upon the above evidence, Judge McClure ordered that James be relieved of future child support obligation, that James pay the $16,000 in child support arrearage plus $2,685 in attorneys' fees, and that the annulment be denied. It is from this judgment that James appeals to this Court.

## STATEMENT OF THE LAW

### Standard of Review

"This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Holloman v. Holloman*, So.2d_, 1996 WL 529540 (Miss.) (citations omitted) .

## I.

### THE TRIAL COURT COMMITTED MANIFEST ERROR IN DENYING JAMES MORTON'S PETITION FOR ANNULMENT.

James first argues that he should have been awarded an annulment, because his consent to the

marriage was obtained by fraud. He contends that Jolene intentionally lied to him about the paternity of her sons and that he would have never married Jolene if he had known that he was not Brandon's father. James asserts that this fraud defeated the essence of the marriage contract, that he never ratified the fraud, and that he should therefore be granted an annulment.

Miss. Code Ann. § 93-7-3(d) allows annulment of a marriage when the consent of either party was obtained by fraud. In such a case, the marriage is void from the time of a court declaring its nullity. A suit for annulment under § 97-7-3(d) must be brought within six months after the fraud is or should have been discovered. Miss. Code Ann. § 93-7-3.

James knew that Jolene was pregnant when they were married, but he says that believed that the child was his. In his testimony at trial, James stated that he believed that Brandon and Josh were his sons until the paternity tests in December of 1993. However, the evidence showed that James's brother told him that Brandon was not his son three months after Brandon was born. Then, in the summer of 1991, James was aware that Brandon was telling people that his real father was Troy Bourque. James also admitted that while they were still married, he suspected that Jolene was not faithful to him. James knew or should have known that Brandon was not his son shortly after his birth, or at least in 1991 when Brandon himself made James aware of that fact. If he wanted an annulment, James should have filed suit within six months of his brother's or Brandon's announcement, when Jolene's alleged fraud became apparent. Instead, James waited until March 10, 1994, well after the six-month deadline prescribed in § 93-7-3. As a result, James's petition for annulment is time-barred.

To show fraud, James would have to prove that Jolene intentionally perverted the truth. The evidence showed that Jolene herself could not be sure who Brandon's father was when she and James were married. Jolene testified that, in her heart, she believed that James was Brandon's father, and both parties agreed that Jolene never told James anything about Brandon's paternity. Based upon this evidence, the chancellor determined that James did not meet his burden of proof to show that Jolene perpetrated a fraud regarding Brandon's paternity. The chancellor did not err in refusing to grant James an annulment, because his petition was time-barred, and because he failed to meet his burden of proof in showing that his consent to the marriage was obtained by fraud.

## II.

### THE TRIAL COURT COMMITTED MANIFEST ERROR IN DENYING JAMES MORTON'S MOTION FOR RELIEF FROM THE JUDGMENT PURSUANT TO RULE 60 OF THE MISSISSIPPI RULES OF CIVIL PROCEDURE.

James next argues that he is entitled to relief under M.R.C.P. 60 from the divorce judgment requiring him to pay child support. Rule 60 in pertinent part reads:

(b) Mistakes; Inadvertence; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

(1) fraud, misrepresentation, or other misconduct of an adverse party;

(2) accident or mistake;

(3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;

(6) any other reason justifying relief from the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment, order, or proceeding was entered or taken.

M.R.C.P. 60. James contends that the divorce judgment would never have been executed if Jolene had been truthful about the paternity of her sons. As a result, James argues, the judgment is void, because it is based upon fraud and should be set aside.

While James requested relief under Rule 60(b)(4) and (6), the essence of his argument is that Jolene committed fraud, which is addressed in Rule 60(b)(1). Again, the chancellor found that James failed to meet his burden of proof showing any fraud perpetrated by Jolene. Testimony differed regarding Jolene's knowledge about her sons' paternity, and both Jolene and James agreed that Jolene told James nothing about Brandon's paternity before their marriage. The chancellor cannot be said to have committed manifest error in holding that the weight of the evidence did not support a finding of fraud. In the absence of sufficient proof of fraud, James's argument for relief under Rule 60(b)(1) is meritless. Furthermore, a Rule 60(b)(1) motion alleging fraud, misrepresentation, or misconduct must be filed within six months of the judgment's entry. James and Jolene's divorce judgment was entered on January 12, 1984, so James's motion filed on March 10, 1994 was time-barred.

James attempts to get around the six-month time limit by arguing that he is entitled to relief under Rule 60(b)(4) and (6). Allowing relief under Rule 60(b)(4) would require proof that the divorce judgment was void due to fraud. As previously stated, James failed to meet his burden of proof on this issue, so Rule 60(b)(4) affords him no relief. Rule 60(b)(6) allows a judgment to be set aside for any *other* justifiable reason. Since James's argument of fraud is specifically outlined in Rule 60(b)(1), Rule 60(b)(6) does not apply here.

It is well-settled in Mississippi that an award of child support is for the benefit of the child, and that an obligation of child support vests in the child so that past-due payments cannot be forgiven by any court. ***Williams v. Rembert***, 654 So.2d 26, 29 (Miss. 1995) (citing ***Department of Human Services v. Rains***, 626 So.2d 136, 138 (Miss. 1993)). "There are clear limitations to the discretionary powers of a trial judge, and one such limitation is that a judge may not utilize the rules of procedure to do that which the substantive law of this State forbids him to do." ***McDonald v. McDonald***, 683 So.2d 929, 934 (Miss. 1996) (reversing chancellor's modification of nonmodifiable lump sum alimony under Rule 60(b)(6)). Clearly, the chancellor in this case did not have the authority to forgive the past-due child support payments that James owed through application of Rule 60.

## III.

**JOLENE MORTON SHOULD HAVE BEEN ESTOPPED FROM CLAIMING THAT JAMES MORTON WAS IN CONTEMPT FOR HAVING FAILED TO PAY CHILD SUPPORT PURSUANT TO THE DIVORCE DECREE, BECAUSE SHE HAD PERPETRATED A FRAUD UPON THE COURT IN PROCURING THE DECREE, AND DID NOT COME INTO COURT WITH CLEAN HANDS.**

James's third argument is simply that Jolene was barred under the clean hands doctrine from receiving relief in her petition for citation of contempt, because she obtained the divorce decree through fraud. The clean hands doctrine prevents a complaining party from obtaining equitable relief in court when he is guilty of willful misconduct in the transaction at issue. *Calcote v. Calcote*, 583 So.2d 197, 199-200 (Miss. 1991) (citing V.A. Griffith, Mississippi Chancery Practice § 42 (1950)). Here, James asserts that Jolene was guilty of fraud in obtaining the divorce decree ordering child support payments, because she indicated in the divorce proceedings that both Josh and Brandon were "born of the marriage." As a result, James argues that Jolene is barred by the clean hands doctrine from bringing her petition for citation of contempt for failure to make child support payments. However, the chancellor did not err in finding that James failed to meet his burden of proof to show any fraud, so the clean hands doctrine does not apply to this case. This assignment of error is without merit.

**IV.**

**THE TRIAL COURT ERRED IN FINDING JAMES MORTON TO BE IN WILLFUL CONTEMPT, AND IN FAILING TO GIVE HIM CREDIT TOWARD HIS CHILD SUPPORT OBLIGATION FOR THE PERIOD OF TIME WHEN THE CHILDREN WERE IN HIS HOME.**

James argues in the alternative that he should at least have been given credit in the trial court's judgment for the months during which Brandon and Josh were living with him. He contends that he should not be required to pay the child support during any time in which Jolene and the children lived with him, because he provided them with shelter, food, clothing, and other necessities during those times.

It is true that this Court has previously allowed reduction of past-due child support payments when it was shown that the child lived with the noncustodial father. *Burkett v. Burkett*, 537 So.2d 443, 445-47 (Miss. 1989). "That is, he is entitled to credit for the amount of support directly given to the child when the custodial parent sues for any arrearage." *Id*. at 446 (citing *Alexander v. Alexander*, 494 So.2d 365 (Miss.1986)). However, this Court determined that the chancellor acted within his discretionary authority in allowing the credit. *Id*. at 445-47.

In this case, the chancellor refused to allow any credit on the arrearage for the time that the children lived with James or for the car payments. James was required to provide Jolene with one-half of her car payments in their divorce decree, so he should not be given credit toward his child support obligation for the car payments. It was within the discretion of the chancellor to award James a credit for the time that Brandon and Josh lived with him while attending school in Batesville, as evidenced by their school records, or for any other period that the chancellor found to have been proven. However, based upon the conflicting testimony regarding the length of time Brandon and Josh lived with James, and the lack of evidence regarding the amount of money that James spent to support the children during such times, it cannot be said that the chancellor abused his discretion in refusing to

give James credit toward his child support arrearage. As a result, no reversible error occurred.

## CONCLUSION

The chancellor in this case did not err in determining that James failed to meet his burden of proof to show that Jolene perpetrated any fraud. Without a showing of fraud, James's arguments for an annulment, for relief from the divorce judgment under Rule 60, and for application of the clean hands doctrine all fail. Similarly, James failed to offer any solid proof of the time during which Brandon and Josh lived with him, so the chancellor did not abuse his discretion in refusing to grant James credit toward his child support arrearage. Because the chancellor based his decision upon substantial evidence with no manifest error, we affirm his decision on appeal.

**AFFIRMED.**

**PRATHER, P.J., PITTMAN, BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. DAN LEE, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION. McRAE, J., NOT PARTICIPATING.**


**DAN LEE, CHIEF JUSTICE, DISSENTING:**

Because I fear the judicial system has been unjustly used and manipulated by an untruthful litigant, I feel compelled to dissent. This manipulation was perpetuated by the lower court's denial of James Allen Morton's Petition for Annulment of a fraudulently induced marriage and resulting order of child support in the face of overwhelming evidence to the contrary, and has resulted in a fraud being perpetrated upon James, and, even more crucial, upon the court system itself. While I have great sympathy for the needs of the children involved in this case and any harm that might come to them, nothing can match the harm already caused by the manipulation and untruthfulness of their mother, Jolene. However, such injustice as evinced by the facts of this case cannot remain unchallenged.

## STATEMENT OF THE CASE

On July 13, 1993, Jolene Anseman (Jolene) filed a Complaint for Citation for Contempt against her ex-husband, James, claiming that he was in arrears on child support in the amount of some $13,000. James filed his Complaint for Annulment of Marriage on March 10, 1994, urging that his marriage to Jolene be annulled on the basis of her fraudulent misrepresentation regarding the paternity of her children. On that same day, James filed a motion seeking relief from the divorce decree requiring him to pay $200 per month in child support. The motion also requested that the Complaint for Citation for Contempt and the Complaint for Annulment of Marriage, as well as the motion for relief, be consolidated.

On March 17, 1994, a hearing was held on the issue of consolidation. All three claims were consolidated and Troy Bourque, because he was an out-of-state witness, testified following the consolidation hearing. All other testimony was heard on September 7, 1994. The chancellor held James in contempt of court and required him to pay the past-due child support of some $16,000 in

monthly installments of $200, attorneys' fees of $2,685, and court costs. The chancellor refused to grant James an annulment, but ordered that James should be relieved from future child support obligations.

## STATEMENT OF THE FACTS

James and Jolene were married on September 16, 1978. Jolene was pregnant at the time and was having sexual relations with James, Troy Bourque, and Randy LeFleur. Jolene believed the child she was carrying was fathered by Troy Bourque, but allowed James to conclude that he, James, was the child's father. James, relying upon that belief, that, married Jolene. The child, B.M., was born on April 24, 1979. On March 25, 1981, Jolene gave birth to a second child, J.M. Jolene admitted that Timothy Drew Robinson was, in fact, J.M.'s father. James was listed as father on both children's birth certificates. He always treated them as if they were his own, led to that belief by Jolene, and held himself out to be their father.

On January 12, 1984, James and Jolene were divorced upon the grounds of irreconcilable differences. Jolene maintained in her petition for divorce that James was the father of the children, knowing full well that they were not his. As a result of the divorce, James was ordered to pay $200 per month in child support. James testified that he agreed to pay the child support because he believed that he was the children's father and wanted to provide support for them.

In July 1993, Jolene filed her second Complaint for Citation for Contempt (the first having been filed in 1986) claiming that James owed some $13,000 in back child-support payments. In December, 1993, James, Jolene, both children, and Troy Bourque had blood tests performed to determine the paternity of the two children. The test results, which were released in January, 1994, revealed that James was not the father of the children. Troy Bourque was also eliminated as the natural father of the children.

On March 10,1994, **within three months of receiving the results of the blood test**, James filed his Complaint for Annulment of Marriage and a Motion for Relief from Judgment and to Consolidate Actions. The claims were consolidated and heard before the chancellor.

Troy Bourque testified that he had been having sexual relations with Jolene during the time she conceived B.M. He testified that Jolene was engaged to James at that point. Additionally Bourque stated in testimony that Jolene, at the time her pregnancy with B.M., told him that he was the father of the child, not James.

James testified that he knew that Jolene was pregnant when they got married, but that she led him to believe that the child was his. He further stated that he would not have married Jolene had he known that he was not the father of the child she was carrying. According to James' testimony, three months after B.M. was born, James' brother told him he was not the child's father. James testified that he confronted Jolene and her mother with that statement, and both Jolene and her mother insisted that James was the father of the child. The record of James' testimony establishes that each time he spoke to Jolene regarding the paternity of the B.M., she insisted that he was the natural father. As to J.M., James stated that he did not inquire as to who fathered J.M., and Jolene never told him. Admitting that he suspected that Jolene was "sleeping around" on him during the marriage and hearing rumors regarding the paternity of B.M., James maintained that he believed Jolene's assertion that he was the

child's father. James testified that he did not know that he was not the children's father until he received the results of the blood tests in January, 1994.

Jolene testified that, at the time she married James, she was not sure of the paternity of the child she was carrying. She acknowledged that she was having sex with Bourque and Randy LaFleur, as well as James, during the period of time surrounding the conception of B.M. Jolene testified that, at that point in time, she believed in her heart that James was the child's father, but admitted that she knew she had been dishonest from the beginning of the marriage because she did not tell James that B.M. was not his child, leading him to believe that the child was his. As to discussions with James regarding the child, she conceded that she had not told James that she knew that he was not the father of B.M. When Jolene became pregnant with J.M., she did not, according to her testimony, tell James that there was no way that he could be the father of the child.

On cross-examination, Jolene conceded that she had lied during the divorce proceedings, claiming that James was the natural father of the children, knowing all the while that they were not his. Jolene acknowledged that in the first contempt action she avowed that James was the father of the children. Jolene's persistent and pervasive lying regarding the paternity of her children is demonstrated by the following excerpt from her cross-examination:

> Q. When you filed for a divorce, did you not state in your pleadings, when you filed proceedings in this cause, did you not state that Jimmy Morton was the father of those two children?
>
> A. Yes, I stated that he was the father.
>
> Q. That was not true, was it?
>
> A. I stated that [he] was the father.
>
> Q. You stated that [B.M.] and [J.M.]--that he was the father of both [B.M.] and [J.M.] in your divorce, did you not?
>
> A. Yes.
>
> Q. And, you knew he was not, is that true?
>
> A. Of [J.M.]
>
> Q. You just stated earlier that you knew right after he was born that he was not the father, before the divorce. So, isn't it true that you knew at the time of the divorce he was not the father? You just stated that he wasn't.
>
> A. Yes.
>
> Q. Wasn't that a lie?
>
> A. That was a lie.
>
> Q. Didn't you state in your first citation for contempt back in 1986 that he was the father of

both children?

A. I stated that, yes.

Q. Was that a lie?

A. Yes.

As evidenced by this testimony, Jolene lied not only to James, but to the court as well.

The chancellor held that James was entitled to an order relieving him of his current support obligation, but that he was not entitled to annulment, nor entitled to relief from the decree ordering past-due child support. A judgment in the amount of $16,000 for past-due child support to Jolene, plus payment of her attorney's fees of $2,685, was entered against James Morton, for a total judgment of $18,685 plus eight percent interest from the date of the judgment forward. The judgment was ordered to be paid at the rate of $200 per month, and a withholding order immediately entered.

## STANDARD OF REVIEW

"This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." ***Holloman v. Holloman***, 691 So. 2d 897, 898 (Miss. 1996) (citations omitted).

## DISCUSSION OF THE LAW

Three issues need to be addressed with respect to the majority opinion and the facts presented by the case *sub judice*. First, James did, indeed, file his Complaint for Annulment of Marriage within the six-month time-frame specified by Mississippi Code Annotated § 93-7-39; therefore his complaint is not time barred. Second, James did prove that Jolene induced him into the marriage by fraud, thereby warranting the granting of his requested annulment. Third, Jolene did not come into this action with clean hands, therefore equity demands that the unjust result in the instant case be rectified.

### I. JAMES FILED HIS COMPLAINT FOR ANNULMENT OF MARRIAGE WITHIN THE SIX-MONTH TIME-FRAME SPECIFIED BY MISSISSIPPI CODE ANNOTATED § 93-7-3.

Mississippi Code Annotated § 93-7-3 specifies that a suit for annulment must be brought within six months after the fraud is discovered or should have been discovered. In the instant case, James testified that he believed that B.M. and J.M. were his sons until the results of paternity tests were received in January, 1994. The record shows that, prior to the blood tests, the only knowledge James had respecting the true paternity of the two children was by way of remarks made by his brother shortly after B.M.'s birth and by B.M. some years later. Jolene's consistent and emphatic response to James' inquiries about the rumors was that he was the natural father. James was faced with the Hobson's choice of believing mere rumor and speculation or believing his wife. Even the court papers filed by Jolene, later acknowledged in her testimony to be fraudulent, reinforced James' belief that he was the children's natural father. **Not until he received the results of the blood test in January, 1994, did James *know* that B.M. and J.M. were not his children.**

Full knowledge of the facts constituting fraud cannot be inferred or deduced from mere suspicion or rumor. **Rabie v Rabie**, 115 Cal. Rptr. 594, 597 (Cal. Ct. App. 1974) ("Suspicion, or a belief founded upon inconclusive circumstances, is not 'full knowledge of the facts constituting the fraud' . . ."). The only knowledge which James could have or should have had respecting the true paternity of B.M. and J.M., which was not pure conjecture and sheer speculation on his part, came from the blood tests performed in December, 1993, and the release of the results in January, 1994. That is the point in time when James discovered the fraud perpetrated upon him by Jolene. On March 10, 1996, well within the six-month time limitation mandated by Mississippi Code Annotated § 93-7-3, James filed his action requesting the annulment of his marriage. His complaint was, therefore, not time barred.

## II. JAMES PROVED BY CLEAR AND CONVINCING EVIDENCE THAT HIS CONSENT TO THE MARRIAGE WAS OBTAINED BY FRAUD ON THE PART OF JOLENE, THEREFORE, PURSUANT TO MISSISSIPPI CODE ANNOTATED § 93-7-3, JAMES' AND JOLENE'S MARRIAGE SHOULD HAVE BEEN DECLARED A NULLITY *AB INITIO*.

The elements of fraud are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the representation's truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. **Allen v. MacTools**, 671 So. 2d 636, 642 (Miss. 1996). Conditions of mind, such as intent and malice, are required to be averred only generally. **Benson v. Hall,** 339 So.2d 570 (Miss.1976); **Edmonds v. Delta Democrat Pub. Co.**, 230 Miss. 583, 93 So.2d 171 (1957). **Allen**, 671 So. 2d 636, 642; see also **Stringfellow v. Stringfellow**, 451 So. 2d 219, 221 (Miss. 1984); **Gardner v. State**, 235 Miss. 119, 108 So. 2d 592 (1959). In the instant case, the burden of proving fraud is upon James. **Stringfellow**, 451 So. 2d at 221.

The following facts, evidenced by the testimony at trial, demonstrate that James carried his burden of proof respecting fraud:

(1) At the time of the marriage, Jolene was pregnant. She knew the child's father was possibly another man, but represented to James that the child was his (a clear misrepresentation of a material fact of which she had knowledge and of which James was ignorant).

(2) James relied upon her representation and entered into the marriage. Otherwise he would not have consented to the marriage.

(3) Jolene became pregnant again, and knowing that James was not the father of that child, allowed him to believe that he was the child's father.

(4) Jolene continued to represent to James that he was the father of both children, while telling others that the children were not his.

(5) James and Jolene were divorced on January 12, 1984 upon grounds of irreconcilable differences. Jolene represented in her court filings that James was the father of both B.M. and J.M.

(6) In July, 1993, Jolene filed a contempt complaint because James was in arrears for the court-ordered child support payments, again representing to James, and the court, that he was the father of the two children.

(7) In December, 1993, Jolene, James, Troy Bourque, and both children submitted to blood tests for the purpose of determining paternity. Results of the tests, released in January, 1994, showed that neither James nor Troy was the father of either child.

(8) In March, 1994, three months after the results of the blood tests were known, James filed his Complaint for Annulment of Marriage and Motion for Relief from Judgment.

The injury to James is clear -- he paid child support over the years for children of whom he was not the father, but whom Jolene consistently held out as his children. Additionally, he was ordered by the court to pay the child support arrearage at a rate of $200 per month.

Clearly, James has proved by clear and convincing evidence that he entered into the marriage as a result of the fraud perpetrated by Jolene. The chancellor should have granted James' request for the annulment of the marriage and vacated the order of January, 1984, mandating the payment of child support by James. The ruling of the chancellor should, therefore, be reversed and remanded as to this issue.

### III. JOLENE DID NOT ENTER THIS ACTION WITH "CLEAN HANDS," THEREFORE, THE UNJUST OUTCOME OF THE INSTANT CASE MUST BE RECTIFIED.

In *Brennan v. Brennan*, 605 So. 2d 749, 752 (Miss. 1992), we emphatically stated:

"[h]e who comes into equity must come with clean hands." *Thigpen v. Kennedy*, 238 So. 2d 744, 746 (Miss. 1970).

*O'Neill v. O'Neill*, 551 So. 2d 228, 233 (Miss. 1989) holds that "[t]he meaning of this maxim is to declare that 'no person as a complaining party can have the aid of a court of equity when his conduct with respect to the transaction in question has been characterized by wilful inequity . . . .'" (quoting V. A. Griffith, *Mississippi Chancery Practice*, § 42 (2d ed. 1950).

In *Thigpen*, *supra*, the Court approved the following description of the maxim in the words of Pomeroy:

"[W]henever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." Vol. 1 *Pomeroy's Equity Jurisprudence*, 4th Ed., Section 397, page 738.

*Thigpen v. Kennedy*, 238 So. 2d 744, 746 (Miss. 1970) (quoting from *Patterson v. Koernor*, 220 Miss. 590, 594, 595, 71 So. 2d 464, 466 (1954)).

The maxim should be applied by the court sua sponte where it is shown to be applicable.

> *Pearson v. Pearson*, 458 So. 2d 711, 713 (Miss. 1984); *Cole v. Hood*, 371 So. 2d 861, 864 (Miss. 1979); *Thigpen*, *supra*, 238 So. 2d at 746-747 (citing *Griffith*, § 42).

*Brennan*, 605 So 2d. at 752.

In the instant case, the majority asserts that, because the chancellor did not make a finding of fraud in the case *sub judice,* the issue of "clean hands" is settled. What the majority fails to realize is that the concept of "clean hands" is not dependant upon the proof of fraud, but is tied to the violation of a principle of equity, such as breach of good faith or conscience in the litigant's prior conduct.

In the instant case, the record is rife with evidence of Jolene's violation of the principles of equity. First, at the very least, she misrepresented material facts to James regarding the paternity of B.M. and J.M., and continued this ruse up until the paternity tests confirmed that James was not the natural father. Second, and more egregious, she admitted that she lied to the court on at least four occasions. The court's order of child support was based upon fraudulent papers filed by Jolene. In the court proceedings in 1986 she continued to lie to the court. Jolene's testimony demonstrates that she lied and manipulated the judicial system for financial gain. Equity cannot allow such blatant and bald-faced actions to remain unremedied.

Jolene came into court asking that James be found in contempt because of his arrearage in child support payments. The chancellor should not have ruled that James was in contempt. Jolene had violated the law of equity by coming into court with unclean hands and should not have been afforded the remedy which she sought. Because Jolene perpetrated a fraud, not only upon James, but also upon the court, the chancellor's ruling should be reversed and rendered, vacating the order of contempt mandating the payment of child support arrearage by James.

## CONCLUSION

I have great sympathy for the children in the instant case. Nothing in this opinion is meant to denigrate or harm them in any way. Jolene's actions, and the blood test results of January, 1994, have already caused great harm to the children. The fact remains, however, that the children are now in their late teens and almost ready to go out on their own. Beyond that, this case is not about the children. This case is about an untruthful litigant subverting and manipulating the court system.

The chancellor, in his decision in the instant case, has abused his discretion and was manifestly wrong. James' claim of fraud was clearly not time barred, as he had no knowledge of the true paternity of his children prior to the results of the blood tests released in January, 1994. He filed his complaint within the six-month time limitation specified by Mississippi Code Annotated § 93-7-3. The chancellor was manifestly wrong because James proved, by clear and convincing evidence, that he entered into the marriage with Jolene as a result of the fraud perpetrated upon him by her.

Additionally and alternatively, the chancellor abused his discretion by not applying the equitable doctrine of clean hands. The chancellor should not have used the extraordinary power of the court to enforce an order when that order was fraudulently obtained and the one seeking that remedy, in this case, Jolene, comes into court without clean hands.

For the foregoing reasons, I must respectfully dissent.