913 So.2d 1030 (2005)
Martin HOWARD, Jr., Appellant
v.
Teresa HOWARD, Appellee.
No. 2003-CA-01129-COA.
Court of Appeals of Mississippi.
May 10, 2005.
*1032 Ronald Alford Herrington, attorney for appellant.
Wayne Smith, Liberty, attorney for appellee.
Before KING, C.J., IRVING and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. Currently pending before this Court are issues of contempt and modification of child support. We affirm the chancery court's order of contempt, but reverse and remand as to the issue of modification.

STATEMENT OF FACTS AND PROCEEDINGS IN THE COURT BELOW
¶ 2. By the time the chancellor entered the orders at issue in the instant appeal, he had been dealing with the parties for over eight years. A brief review of the prior proceedings is necessary for an understanding of the issues currently before the Court. Martin Howard, Jr. (Martin) was divorced from Teresa Howard (Teresa) in 1995 by decree of the Chancery Court of Pike County, Mississippi. By judgment dated November 17, 2000, Martin's child support obligations for his three children were increased from $2,100 per month to $2,500 per month; both before and after the modification, Martin was also ordered to pay the mortgage on the marital home in which Teresa and the children continued to reside and the reasonable educational expenses of the three children, including but not limited to private school tuition. These amounts totaled apparently $5,100 per month. At this time, Martin was a surgeon, with an income exceeding $200,000 per year.
¶ 3. On June 13, 2001, Martin petitioned the chancery court for modification *1033 of child support, contending that since the date of these orders, there had "been a substantial and material change in circumstances in that the petitioner sustained an injury to his hand and has been required to undergo surgery on his right hand and will no longer be able to practice his chosen profession, i.e., that of a surgeon, and, therefore, his income has or will decrease substantially." He requested the court to reduce his child support to an amount commensurate with his new or anticipated income and to terminate the requirement that he pay the educational expenses of the children. Teresa denied Martin's allegations regarding material change in circumstance and raised the "clean hands doctrine" as an affirmative defense,[1] claiming that Martin had "wilfully and contemptuously refused to pay" a number of items ordered by the court.
¶ 4. Following discovery, the matter was heard by the chancery court on October 30, 2001. Martin testified that following carpal tunnel release in November 2000, his dexterity decreased and he had difficulty holding objects. In April, 2001, he took a medical leave of absence and consulted with Dr. Aubrey Lucas, an orthopaedic surgeon who specialized in hand surgery. Dr. Lucas testified by way of deposition; his office notes were attached as an exhibit. Following his initial examination of Martin on April 27, 2001, Dr. Lucas referred him to a neurologist for a nerve conduction study, an anesthesiologist for pain management and, to an occupational therapist for strength, range of motion and sensation measurement. Upon reviewing the results of these examinations, Dr. Lucas recommended continued evaluation by the pain management specialist and, a return visit to Dr. Lucas in two weeks. Martin did not return. Three months later, he telephoned Dr. Lucas advising that he had made plans to start a pathology residency at the University of South Alabama in the next few weeks due to his inability to hold laparoscopic instruments for more than one to two minutes without significant pain and numbness. He asked Dr. Lucas to give a deposition for use in chancery court proceeding and made an appointment for Dr. Lucas to update his condition before the deposition. On August 28, Dr. Lucas detected no visible abnormalities with Martin's hands and found the range of motion to be good. Dr. Lucas recommended that "if his condition does not improve and if he still feels unable to practice as a general surgeon, I would recommend a 2nd opinion regarding that issue...." In response to a request for information from Martin's disability insurer, Dr. Lucas wrote, on September 12:
Martin has plans to complete a pathology residency and does not have plans to return to his normal practice of general surgery which included laparoscopic procedures. At this current time Martin is under restrictions that would not allow him to hold the laparoscope for extended periods of time. I discussed with Martin that if his condition continues to provide problems related to using the laparoscopic equipment and to returning to normal employment as a general surgeon, I would recommend a 2nd opinion regarding this issue .... At this time Martin has not been released to his regular occupation. He has been released to perform the office or clinic component of his surgical occupation and has been free to do so since I originally saw Martin on 4-27-01. The medical restrictions to avoid the use of the laparoscope will *1034 be in effect until 12-1-01. I hope at that time to either hear from Martin that he can return or to obtain a 2nd opinion regarding this issue.
Dr. Lucas testified that while Martin could perform some simple surgical procedures, he could not perform the laparascopic component of his practice which, according to the history, was the majority of his practice. When asked whether there was a need for Martin to change occupations at that time, Dr. Lucas responded "[a]t this point and (sic) time, there were probably many personal reasons that I don't feel that I should be in the middle of.... As far as physical reasons for changing occupations, I would say it's premature. But, he might have many reasons he's factoring in." (emphasis added).[2]
¶ 5. By letter opinion dated November 2, 2001, the court found Martin's decision to abandon his career as a surgeon to be "premature" and denied his request for modification. The court found "no vocational evidence" to support Martin's position; instead, the court found "strong evidence from Dr. Lucas that Martin was motivated to make a change by considerations other than his medical condition." The court concluded that all of these matters "show clearly that Martin was, at the least, premature in the decision to abandon his career as a surgeon." Citing Parker v. Parker, 645 So.2d 1327, 1331 (Miss.1994) that an obligor cannot obtain modification of support when he, acting in bad faith, voluntarily worsens his financial position so that he cannot meet his obligations, the court found that Martin made the decision to change careers when he knew the extent of his obligations and that his decision would prevent him from being able to comply with the court's order. The court determined that "Martin must accept responsibility for that ill-timed and ill-advised decision that was at best premature."
¶ 6. The court further found that Martin came to the court "with unclean hands in that he failed to perform his obligations and has failed to show a lack of ability to perform." The court noted that during a substantial part of the time Martin claimed to be losing his surgical practice and to be in great pain, he continued to maintain and regularly use his membership in a country club to play golf. The court found engaging in such activities while claiming inability to perform to be "extremely inequitable" and concluded that Martin's "own lifestyle doesn't bear... sacrifices" similar to those he asked the court to order with respect to his children's educational and home experiences. Accordingly, the court denied his request for modification.
¶ 7. Martin took no appeal from the chancellor's ruling and acknowledges that he is currently bound by the decision. The chancery court held Martin in contempt twice during 2002. First, by order dated January 30, 2002, the court found Martin in wilful and obstinate contempt of prior orders of the court respecting, inter alia, his failure to pay monthly mortgage payments on the marital home, child support and educational expenses; the court ordered him incarcerated until he purged himself of contempt by paying all amounts specified in said order (approximately $24,000) and by complying with other non-monetary provisions. Second, by order dated April 19, 2002, the court found Martin in contempt of the January 30, 2002 order and also of additional items, including continued failure to pay the mortgage and other expenses relating to the marital *1035 home, educational and child support obligations, medical expenses and attorney's fees. The court ordered Martin to be incarcerated until he purged himself of contempt (by paying approximately amount of $67,000, which incorporated all amounts due and owing under the January 30 order).[3] Again, Martin filed no appeal seeking review of these orders.[4]
¶ 8. Martin subsequently sought protection under Chapter 13 of the United States Bankruptcy Code and, on September 16, 2002, moved the chancery court to withdraw all arrest warrants based upon contempt until the bankruptcy stay was lifted. Following dismissal of the bankruptcy petition (which Martin states was due to Teresa's refusal to consent to the proposed reorganization plan), the chancery court issued an order to arrest and incarcerate Martin until he purged himself of contempt as specified in the April 19, 2002, order of the court. Martin was arrested on January 14, 2003, and two days later filed the instant motion to modify/suspend support obligation and motion for release from incarceration, contending that he had no money, had exhausted all liquid assets to satisfy the standing orders of the court, was "unable to practice medicine as a surgeon as was his previous employment due to a medical/physical disability which is beyond his control," and was entitled to modification of his child support obligation based upon his current income of approximately $3,000 per month from his pathology internship. On January 17, 2003, Teresa filed the instant motion for citation for contempt, claiming Martin to be in contempt not only of the April 19, 2002, order but also of his continuing obligations under prior orders of the court. The chancery court ordered that Martin could be temporarily released from incarceration on a cash bond of $36,500; Martin paid this amount on January 19, 2003 and was released, having spent five days in jail.
¶ 9. Hearing was held before the chancery court on April 17, 2003, regarding Teresa's motion for contempt and Martin's motion for modification of child support. The parties stipulated that Martin's arrearage as of April 17, 2003 was $100,620.43. Teresa testified that she works approximately thirty hours a week and last year made $15,900, which was insufficient to cover her house payments. She has borrowed money from her family and inherited part of a small estate of her father. Teresa testified that while she had considered moving into a different home with a lower monthly note, she did not qualify for other loans because of the negative liens on her credit report that Martin had failed to clear up previously. Teresa testified that the minimum amount that she needed in order to make ends meet considering the children's educational expenses, insurance, clothing, food, and housing was $2,500 per month.
¶ 10. Martin admitted that he had unilaterally reduced his child support payments from $2,500 to $500 per month but had not even paid Teresa that amount since his release from jail. Martin testified that it was his understanding that he was incarcerated because of past due child support payments and that when he paid the amount set by the court for his release, *1036 that he had paid all the past-due child support plus an extra amount which had him current until the middle of the summer. He testified that he has been paying the $500 he would normally pay to Teresa to his brother-in-law in partial repayment of the amount that he borrowed to secure his release from jail. Martin testified, "that was my misunderstanding completely."
¶ 11. As to the requested modification, Martin testified that he was continuing his medical education to become a pathologist because it is one of the few fields of medicine left open to him without the use of his right hand for fine motor skills; his salary as a second year resident was $37,500. He reported that the malpractice coverage for his surgical career had been cancelled due to the number of claims which had been filed; he testified that he was currently litigating six malpractice claims. While Martin testified that he was currently seeing three different physicians, he did not call any of them as witnesses to support his contention regarding inability to perform surgery. He testified that he anticipated completion of his residency in September 2005 and that his salary as an entry level pathologist should be approximately $150,000.
¶ 12. By letter opinion of April 22, 2003, the chancery court ruled that Martin's failure even to attempt to pay any part of his child support or other obligations from January 2003 to April 2003 constituted wilful contempt of the court; incarceration was, however, suspended for a period of twenty-one days to allow Martin to purge himself of the contempt by paying $10,000, being the arrearage in child support which had accrued since January 2003. As to modification, the court rejected Martin's request that his obligations be reduced due to the drop in his income for a number of reasons. First, the court found that the issue had previously been presented to the court and determined adversely to Martin by letter opinion of November 2, 2001. Second, that Martin "does not appear before the court with `clean hands,' especially in light of his complete failure to pay any amount toward child support or any other obligation since he was released from jail in January 2003." Third, that while the "realities of th[e] drop" in Martin's income were "evident," he had "not taken reasonable steps to try to correct" the matter. The court determined, however, that "despite the lack of entitlement to any modification," Martin's obligations to Teresa should be reduced to $2,500 per month, with the balance of all other sums, approximately $2,600 per month continuing to accrue; the failure of Martin to pay the additional amounts until further order of the court would not constitute contempt. The additional amounts would be "abated but not forgiven." The letter opinion was incorporated into an order of the court on May 19, 2003, which decreed Martin to be in arrears for non-payment of child support and other obligations in the amount of $100,620.43, to bear interest at the legal rate of 8% per annum, to be in willful contempt of the prior decrees of the court, to be incarcerated for said contempt unless $10,000 towards the arrearage be paid within twenty-one days, and to pay child support in the amount of $2,500 per month beginning May 1, 2003, with all other sums to continue to accrue.
¶ 13. On May 29, 2003, Martin filed a notice of appeal, and Teresa filed a motion for reconsideration. The chancery court granted Teresa's motion, and by order dated July 2, 2003, reversed its ruling regarding the reduction of child support. In open court, the chancellor determined:
it was error for me to allow Dr. Howard to reduce his child support. By way of explanation, Dr. Howard approached the *1037 court on a motion to modify ... regarding his claim that he was no longer able to practice as a general surgeon. The court found that position to not be substantiated, that he had elected to withdraw from the surgical field and his own treating physician didn't support that position at the time he made it. The court ruled on this matter on April 22d. I was attempting to address the information that I had and apply it to the difficult case where Dr. Howard now claims that he only had an income of approximately $3,000 a month in his pathology residency at the University of South Alabama.... But the court, I believe, committed error in making that determination on April 22d. The realities are that apparently Dr. Howard's income is that amount. However, that was the same defense and position he had taken and the court had previously ruled on that. So, in essence the law of the case in this particular instance is controlling, and the court has previously ruled and denied that relief, and, therefore, the court erred in making that determination and I now reverse that ruling and reinstate the provisions that existed immediately prior to the April 22d, 2003 ruling and the order that followed that ruling.

JURISDICTION
¶ 14. Both parties claim jurisdictional defect with respect to the actions taken by the other party. Neither contention has merit. Martin argued in his primary brief that the lower court lacked jurisdiction to reconsider the order of May 19, 2003, because he had placed his notice of appeal in the mail on May 27, 2003, prior to Teresa's filing her motion for reconsideration on May 29, 2003. Teresa's motion for reconsideration was actually stamped filed by the clerk approximately one hour before Martin's notice of appeal was stamped filed by the clerk on May 29, 2003. Martin appears to concede his argument in his reply brief; however, to clarify, we note that Rule 25 of the Mississippi Rules of Appellate Procedure provides that while filing may be accomplished by mail, it is not "timely unless the papers [other than briefs and record excerpts] are received by the clerk within the time fixed for filing." The comment confirms that while filing briefs and record excerpts "is deemed to take place on the day of mailing" if certain requirements are met, "[o]ther papers are deemed filed when filed with the clerk." M.R.A.P. 25(a) and cmt. Accordingly, Martin's notice of appeal was not filed on the date of mailing but upon the date it was actually received by the clerk of the trial court at which time the clerk had already received and stamped Teresa's motion for reconsideration. Further, the comment to rule 4(d) of the Mississippi Rules of Appellate Procedure states that a notice of appeal "filed before the filing of one of the specified [post-trial] motions or after the filing of a motion but before its disposition is, in effect, suspended until the motion's disposition, whereupon the previously filed notice effectively places jurisdiction in the Supreme Court." M.R.A.P. 4(d) cmt. (emphasis added). Accordingly, regardless of whether Martin filed his notice of appeal before or after Teresa's timely motion for reconsideration, his argument is without merit.
¶ 15. Teresa argues that Martin's appeal, filed May 29, 2003, was untimely under Rule 4(d) of the Mississippi Rules of Appellate Procedure because the trial court's last order was not entered until July 2, 2003, and Martin did not file a subsequent notice of appeal. While this result would have been correct prior to the 1998 amendment to the rule, Rule 4(d) now provides that while a notice of appeal filed *1038 before disposition of specified post-trial motions is ineffective pending disposition of said motions, the notice ripens into an effective appeal upon disposition of the post-trial motions. Rule 4(d), in relevant part, states:
A notice of appeal filed after announcement or entry of the judgment but before disposition of any of the above motions is ineffective to appeal from the judgment or order, or part thereof, specified in the notice of appeal, until the entry of the order disposing of the last such motion outstanding.
M.R.A.P. 4(d) (emphasis added). The comment to Rule 4(d) specifies that the notice of appeal "will ripen into an effective appeal upon disposition of a post trial motion. . . ." M.R.A.P. 4(d) cmt. Unlike the federal counterpart, under Mississippi Rule 4(d) a "valid notice of appeal is effective to appeal from an order disposing of a post trial motion." Id. Thus, we find the court has jurisdiction to review both the orders of May 19, 2003 and July 2, 2003.

STANDARD OF REVIEW
¶ 16. The scope of review in domestic relations matters is strictly limited. Brawdy v. Howell, 841 So.2d 1175, 1178 (¶ 8) (Miss.Ct.App.2003). "This Court will not disturb the chancellor's findings unless the court's actions were manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard." Andrews v. Williams, 723 So.2d 1175, 1177(¶ 7) (Miss.Ct.App.1998) (citing Sandlin v. Sandlin, 699 So.2d 1198, 1203 (Miss.1997); Johnson v. Johnson, 650 So.2d 1281, 1285 (Miss.1994); Crow v. Crow, 622 So.2d 1226, 1228 (Miss.1993); Gregg v. Montgomery, 587 So.2d 928, 931 (Miss.1991)).

ANALYSIS
¶ 17. Both parties intermingle the issues of contempt, modification, and "unclean hands." The trial court, however, did not; the order and opinion specifically differentiated between the contempt and modification issues, and considered the "unclean hands" doctrine only with respect to modification. The trial court clearly separated these issues, and so will we.

I. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING MARTIN IN CONTEMPT OF THE PRIOR ORDERS OF THE COURT.
Whether a party is in contempt of court is left to the chancellor's substantial discretion. Cumberland v. Cumberland, 564 So.2d 839, 845 (Miss.1990). However, clear and convincing proof is required. Id. When a party is unable to pay court ordered support, the proper action for him to take is to promptly file for a modification of support. When this course of action is followed, a finding of contempt is not proper. Cumberland, 564 So.2d at 847; Thurman v. Thurman, 559 So.2d 1014, 1016-17 (Miss.1990). When a party fails to take this course of action, he must "make out a clear case of inability." Duncan v. Duncan, 417 So.2d 908, 908 (Miss.1982). Where substantial evidence supports the chancellor's finding that payments could have been made, this Court will not reverse. Rainwater v. Rainwater, 236 Miss. 412, 421, 110 So.2d 608, 611 (1959).
Shelton v. Shelton, 653 So.2d 283, 286-87 (Miss.1995)
¶ 18. Martin contends that the trial court's "continued finding of contempt and . . . refusal to allow [him] to assert a defense, citing reliance upon the `unclean hands' doctrine was, and continues to be, an abuse of the court's discretion." (Reply Brief at 4). The only contempt order *1039 presently before the court is the order of April 22, 2003; Martin failed to appeal the prior orders of contempt, and they are not before us on appeal. Contrary to Martin's assertion, the trial court did not find Martin in "continued" contempt of court, refuse to allow him to assert a defense, or rely on any of his prior defaults, or "unclean hands," in rendering the current order of contempt. The record clearly reflects that the trial court found Martin in willful contempt solely based upon his "failure to pay or even attempt to pay any part of his child support, as well as other obligations, from January 2003 though April 2003...."
¶ 19. Inability to pay is a defense to a prima facie case of contempt, Newell v. Hinton, 556 So.2d 1037, 1044 (Miss.1990). Martin's only explanation for failing to make any payments for the first four months of 2003 was, however, not inability to make any payment but his belief that he was current until the middle of the summer; he actually paid the $500 he normally sent Teresa to his brother-in-law instead. The court determined Martin's "contention that he thought he was `paid' up in advance [to be] without any merit whatsoever." Nothing in the record compels a different finding.[5] Martin's briefs do not even address his failure to make any payments from January to April 2003 or the court's finding that his explanation was wholly without merit. Therefore, we uphold the chancellor's finding of contempt.
¶ 20. Whether Martin may be incarcerated for contempt is a different matter. Quoting Jones v. Hargrove, 516 So.2d 1354, 1358 (Miss.1987), Martin argues that "where the contemnor is unable to pay, even if that present ability is due to misconduct, imprisonment cannot accomplish the purpose of the civil contempt decree, which is to compel obedience." Inability to pay must be proved with particularity. Id. at 1357. The court's April 2003 order directed Martin pay $10,000 toward the arrearage in twenty-one days or he would be incarcerated. Martin does not specifically challenge the court's setting $10,000 as the amount necessary to purge the contempt but argues generally that he cannot be incarcerated for inability to pay. The record adduced at the April 2003 hearing reflects that Martin dissolved his retirement account in November 2001; and thereafter used $22,589.83 to pay the debt on his car. The car, currently titled in the name of his new wife, was valued at $12,000. Martin further failed to account for the $5,179.81 shown as a "balance" of the retirement distribution. We do not find that Martin proved inability to pay in April 2003.
¶ 21. The trial court's power to commit Martin to jail until he complies with the terms of the order depends upon Martin's present ability to comply with the order at the time it is enforced. See Hargrove, 516 So.2d at 1357 (citing Wilborn v. Wilborn, 258 So.2d 804, 805 (Miss.1972)). Regardless of whether Martin had the financial ability to pay the $10,000 in April 2003, the court must, upon proper motion, revisit the issue at the time the order is executed. In Riser v. Peterson, 566 So.2d 210 (Miss.1990), the Chancery Court of Madison County found the mother of two minor children in contempt for failing to pay child support but ordered her incarceration suspended until the next hearing, approximately one month later; if the mother had not purged herself of contempt by *1040 that time, the suspension would be withdrawn. At the second hearing, the mother attempted to put on evidence of inability to pay as of that date; the chancellor foreclosed her proof, finding that he had, at the first hearing, determined the question of ability to pay. On appeal, the Mississippi Supreme Court reversed, holding "[i]nability to pay to avoid incarceration is a continuing defense as imprisonment does not accomplish the purpose of the civil contempt decree." Id. at 211. The court stated that when the chancellor suspended the incarceration, that suspension carried with it the right of the mother prior to the hearing to determine whether she should be incarcerated and an opportunity to again offer proof on the defense to the incarceration of inability to pay; the court found reversible error in the chancellor's refusal to hear that proof. The court admonished the bench and bar that a "LITIGANT IS ALWAYS ENTITLED TO OFFER EVIDENCE OF INABILITY TO PAY AS A DEFENSE, NOT TO THE CONTEMPT, but to the incarceration." Riser, 566 So.2d at 211-12. Accordingly, at the time the order of incarceration is executed, Martin may file a motion with the chancery court attempting to prove, with particularity, his present inability to pay.

II. WHETHER THE CHANCERY COURT ERRED IN DENYING MARTIN'S MOTION FOR MODIFICATION
¶ 22. The lower court was presented with the "difficult case" of how to resolve the "realities" of the drop in Martin's income with its November 2001 ruling that his decision to withdraw from the surgical field was "premature." The court identified three reasons Martin was not entitled to modification but nonetheless sought to find an equitable solution to the problem;[6] thereafter, finding that he had erred in formulating the solution, the chancellor reconsidered and reinstated the prior order of support. We find that two of the three reasons given by the chancellor for denying Martin's motion for modification (and the reason for reconsideration) did not preclude modification. While we find the third reason supported by the evidence, we cannot determine whether the chancellor would have ruled as he did in the absence of all three reasons. Therefore, we reverse the denial of modification and remand the case to the chancery court for further consideration. Nothing in this opinion should be construed as indicating how the chancellor should rule on remand.
¶ 23. The three reasons identified by the chancery court for denying Martin's request for modification were that the court had considered Martin's position in 2001, that Martin was before the court with "unclean hands," and that Martin had not taken reasonable steps to try to correct his financial situation. First, as to the effect of the November 2001 order denying Martin's first motion for modification, the trial court correctly determined Martin to be bound by the ruling that as of that date, his decision to change professions was "premature." The ruling does not foreclose, however, a determination that by April 2003, the decision whether to practice surgery was no longer in Martin's hands, so to speak. The Mississippi Supreme Court has long held that a decree as to child custody is "never final" as it is subject to modification:
"A decree or judgment awarding the custody of a child ... is res judicata and conclusive of the facts, and the rights of *1041 the parties, existing at the time it was rendered. * * * And no court will modify or change the judgment or decree touching custody, so long as the facts remain substantially the same. * * * But in all cases where the facts and circumstances have materially altered the chancery court ... may on proper proceedings alter the decree . . ."
Reno v. Reno, 253 Miss. 465, 472-73, 176 So.2d 58, 61 (1965) (quoting Honeywell v. Aaron, 228 Miss. 284, 87 So.2d 562, 565 (1956) (opinion modified by 228 Miss. 284, 88 So.2d 558 (1956))). The same is true as to modification of child support obligations. In Miss. Dept. of Human Services v. Shelby, 802 So.2d 89 (Miss.2001), the supreme court recognized that when a court of competent jurisdiction enters a final judgment on the merits of an action, the doctrine of res judicata[7] precludes parties from relitigating claims which were or could have been raised. Shelby, 802 So.2d at 95-96 (¶¶ 24-27). Accordingly, where a parent has litigated to conclusion a motion for modification of child support, that parent is "precluded from relitigating a claim that could have been presented in her original motion to modify." Id. at 96(¶ 27). The terms of child support are, however, "inherently modifiable upon a showing of a material change in circumstances." Id. at 96(¶ 29).
¶ 24. While Martin is precluded from relitigating any claim which was or could have been presented in his original motion to modify support obligations, he is not precluded from showing a material change in circumstances occurring subsequent to the November 2001 opinion. Martin argues that the number of malpractice cases pending against him and the cancellation of his malpractice insurance precluded him from practicing as a surgeon in April 2003. The April 22, 2003 letter opinion merely reflects that as to Martin's claim of reduced income, "this issue has been presented to the Court previously and the Court ruled adverse to Dr. Howard's position (see Court's letter opinion of November 2, 2001....) Therefore Dr. Howard is not entitled to the relief which he now seeks." We find that the chancery court should have considered any evidence of events occurring subsequent to the November 2001 opinion to determine whether a substantial and material change had occurred justifying modification of Martin's support obligations.
¶ 25. The second reason given by the trial court for denying Martin's motion for modification was that Martin "does not appear before the court with `clean hands.'" Martin argues that the trial court misapplied the "unclean hands doctrine." He laments that there is no way for him now to cleanse his hands and receive the modification he desperately requires due to his reduced income. In Lane v. Lane, 850 So.2d 122, 126-27 (¶¶ 13-14) (Miss.Ct.App.2002), we recognized that a party's "entering [the court of equity] with unclean hands does not dictate the conclusion that he left with unclean hands" so as to prevent modification of his support obligations until he has paid all arrearage. In the instant case, we agree with the chancellor's finding that *1042 Martin came into court with unclean hands; however, we conclude that the chancellor's order adjudicating the amount of Martin's total arrearage had the effect of cleansing Martin's hands so as to allow modification of his child support obligations, should the chancery court otherwise find modification to be warranted.
¶ 26. The basic premise of the clean hands doctrine is that Martin should not be allowed to obtain equitable relief where his willful misconduct caused his current situation. See Calcote v. Calcote, 583 So.2d 197, 199-200 (Miss.1991). In Bailey v. Bailey, 724 So.2d 335 (Miss.1998), the Mississippi Supreme Court stated:
[A] husband may not petition for modification of the original decree without showing either that he has performed it or that his performance has been wholly impossible.... However, a husband may exonerate himself from failure to make alimony or child support payments as ordered, because of his inability to pay, but his evidence must be made with particularity and not in general terms."
Bailey, 724 So.2d at 337 (citing Hooker v. Hooker, 205 So.2d 276, 278 (Miss.1967)). Further, this Court has confirmed that the evidence presented must be specific:
A husband is required to show what his earnings, his living expenses, and who his dependents are. Kincaid v. Kincaid, 213 Miss. 451, 456, 57 So.2d 263, 265 (1952). Yet, "the payment of other debts or expenses will not excuse or justify his default, unless such payment was necessary in order to continue his business or occupation, because his wife's right to alimony is a prior and paramount claim on his earnings." Gregg, 587 So.2d at 932. Moreover, if a husband wishes to prove an inability to pay, his evidence must show "that he earned all he could, that he lived economically, and paid all surplus money above a living on the alimony decreed to his wife." Kincaid, 213 Miss. at 456, 57 So.2d at 265.
Lane, 850 So.2d at 126(¶ 12). In Lane, the husband claimed that the doctrine of "unclean hands" did not apply to him because he had shown his inability to pay his child support and alimony. This Court held that the husband failed to show with particularity that he was earning all he could, that he lived economically, and paid all surplus money above living expenses to his obligations and thus came to court with unclean hands. Id. at 126 (¶¶ 9, 12-13).
¶ 27. Martin, like the husband in Lane, has failed to show his inability to pay with particularity. The first requirement of Martin's showing that he "earned all he could" is interwoven with the issue of whether, by April 2003, a material change in circumstance had occurred which converted Martin's "premature" decision into no longer under his control. While we found that the chancellor did not fully consider this first issue, there was substantial evidence before the court that Martin did not meet the second and third requirements of living economically and applying all of his surplus money towards his obligation to support his children. In determining Martin to have "unclean hands," the court relied upon the fact that Martin failed to make any payment on his obligations for four months following his release from incarceration; this was during the same time frame that a $350 check was written on the account of Martin's current wife for Martin and his brother to play in a golf tournament. The court found that while Martin is entitled to recreation, he may not do so while his children are doing without basic necessities of *1043 life.[8] We agree with the chancellor's finding that Martin came into court with unclean hands.
¶ 28. In Lane, however, this Court determined that entering the court with unclean hands "does not dictate the conclusion" that one leaves with unclean hands "so as to prevent any modification of his support obligations until he had paid all arrearage." Lane, 850 So.2d at 126-27 (¶¶ 13-14). Relying on Brennan v. Brennan, 605 So.2d 749, 753 (Miss.1992), the Lane Court concluded that the chancellor's entry of final judgment of total arrearage "cleansed [the husband's] hands and revived the matter of modification." The court of appeals affirmed the monetary judgment and the finding of contempt rendered against the husband; however, the court remanded the issue of modification for further action. In the instant case, the chancellor's May 19, 2003 order adjudicated Martin to be $100, 620.43 in arrears and ordered that the legal rate of interest of 8% per annum would be applied. We find that, under Lane, the entry of judgment in that amount had the effect of cleansing Martin's hands and reviving the matter of modification.
¶ 29. The third basis for the chancery court's denial of Martin's motion for modification was the finding that Martin had not taken reasonable steps to try to correct his financial situation. Martin argues that the court's factual finding that he had not taken reasonable steps to try to correct his income goes against the overwhelming weight of the evidence. We disagree with Martin's contention; the evidence shows Martin was paying $1,600 a month in rent, afforded a $350 afternoon of golf, and still managed to donate $300 to charity each month. While we find the court's reason was supported by the record, we cannot determine whether this third reason alone would have caused the chancery court to deny modification. The chancellor's concern over the "realities" of Martin's reduction of income and the court's attempt to alleviate part of Martin's monetary burden, even temporarily, leads us to believe that the chancellor may have ruled differently had the other two reasons for denying modification not been present. As we have found error in the chancellor's determination of those two other issues, we remand the matter of modification for further consideration by the court.
¶ 30. Lastly, we address Martin's public policy argument, that to "second guess" his decision that "he is incapable of safely performing surgery is deleterious to our community interests and repugnant to the public policy." He claims that the chancellor's opinions leave him with "no alternative" but to go back into surgery in order to generate the income necessary to satisfy the obligations ordered by the court. While we certainly appreciate the *1044 public safety implications of the chancery court's orders, the chancellor is not required to rely on Martin's uncorroborated testimony regarding his medical condition. In September of 2001, Dr. Lucas testified that Martin's decision to change occupations was "premature" and that in the event that Martin's condition provided problems returning to "normal employment as a general surgeon" in December 2001, he would recommend Martin obtain a second opinion. Yet Martin took it upon himself to give up his surgical practice and enter training for a different field of medicine prior to December 2001. Nowhere in the record does it reflect that Martin ever followed his physician's advice to seek a second opinion. He certainly has never offered any further medical testimony to the court. In Poole v. Poole, 701 So.2d 813 (Miss.1997), the Mississippi Supreme Court affirmed the chancery court's denial of modification of child support where the physician payor "offered no evidence, other than his own testimony, that he was unable to effectively handle the stress of his OB/GYN practice." The supreme court found that the chancellor did not err in finding that the physician "failed to establish that he was unable to earn more income by pursuing his specialty." Poole, 701 So.2d at 815-16, 818 (¶¶ 11, 21). In the instant case, the chancery court is, and has been, perfectly within its discretion to require a "second opinion" as to Martin's condition.
¶ 31. THE JUDGMENT OF THE CHANCERY COURT OF PIKE COUNTY IS AFFIRMED AS TO THE CONTEMPT ORDER AND REVERSED AND REMANDED AS TO THE MODIFICATION ISSUE. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY TO THE APPELLANT AND APPELLEE.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.
NOTES
[1] The doctrine prevents a complaining party from obtaining equitable relief when he is guilty of willful misconduct in the transaction at issue. Bailey v. Bailey, 724 So.2d 335, 337(¶ 6) (Miss.1998).
[2] Dr. Lucas testified that when he spoke with Martin on August 28, he discussed several issues "outside normal discussions about his hand" including child custody and uncontrolled rage. Dr. Lucas recommended that Martin see a psychologist or psychiatrist.
[3] The court also divested Martin of his ownership in the marital home in order that Teresa might refinance the debt. Martin retained, however, an equitable interest in the home for which he would be compensated upon any sale of the home, subject to his payment of all outstanding arrearages.
[4] Martin was apparently unrepresented at this time as his former attorney had been allowed to withdraw on March 1, 2002, upon representing to the court that Martin would not answer his calls or mail or communicate with him in any way.
[5] In fact, the record reflects that Martin's request that his monthly child support obligations be reduced until a hearing on the merits had been denied by the chancery court on March 28, 2003.
[6] We note that even the chancellor's equitable solution did not satisfy Martin as he filed his notice of appeal following rendition of the court's original order.
[7] The lower court cited "the law of the case" as the reason for granting Teresa's motion for reconsideration and reinstating the prior support orders. The doctrine of "law of the case" is similar to res judicata but relates entirely to questions of law. Florida Gas Exploration Co. v. Searcy, 385 So.2d 1293, 1295 (Miss.1980). As the chancery court's November 2001 finding that Martin was was premature in his decision to abandon his surgical career was an issue of fact rather than law, we interpret both the chancellor's first reason for denying Martin's second motion for modification and his reason for granting Teresa's motion for rehearing to be based on the doctrine of res judicata.
[8] While Martin testified that his brother paid for the tournament, the check was written on the account of Martin's current wife. Martin's testimony confirmed that a number of the items he listed on his statement of monthly expenses covered his wife's expenses as well. For example, the amount written on his wife's account for the golf tournament would have covered almost the entire amount Martin listed on his statement for groceries for himself and his wife for the entire month. In the November 2, 2001 letter opinion, the trial court found that while there was nothing wrong with Martin's having a membership to play golf, performing such activities at a time when he claimed inability to meet his support obligations showed that he came to the court with unclean hands at that time. The April 5, 2003 check for the $350 registration fees for the golf tournament evidences that Martin's costly recreational activities continued even when he was not paying anything toward his support obligations.