John William Brennan filed a petition for modification of alimony provisions of a prior divorce decree rendered in the Chancery Court of Washington County, Mississippi. Anna Anthis Brennan answered and opposed the complaint to modify and moved for a citation of contempt against Brennan for failure to comply with the terms of the October 25, 1984, decree. After a full hearing, on December 26, 1990, the lower court dismissed the petition for modification of the decree as well as the cross-complaint for contempt. Mrs. Brennan has appealed the judgment of the lower court dismissing her cross-complaint for contempt and Mr. Brennan has cross appealed the dismissal of his complaint seeking modification.
 FACTS
Anna Anthis Brennan, age 61 at the time of this trial, and John William Brennan, age 65, were divorced, after 32 years of marriage, by a decree of the Chancery Court of Washington County on October 25, 1984. Their four children were all emancipated and the only provisions for the future relationship between the parties dealt with future support obligations. One *Page 750 
provision of the decree stated that John would pay, in lieu of alimony, one-half of his net retirement benefits from the Army to Anna each month and retain for her a survivor's benefit plan offered by the Army. The decree also provided that the payments could be reduced by a Court of competent jurisdiction, if a material change of circumstances was later shown.
The "SEPARATION AND PROPERTY SETTLEMENT AGREEMENT" incorporated into the decree further contained a provision that required Anna to notify John, in writing, of any property she received by gift or through devise or descent from members of her family. This provision was included in the agreement due to the very real possibility that Anna would receive property through her somewhat wealthy father, reducing or eliminating the need for support from John.
Compliance with the terms of the decree was not a high priority for either party. When John began making the first payments of one-half of his army retirement benefits, the amount paid was $1,211.30. At first, John received the entire benefit from the Army, then wrote Anna a personal check for the one-half due to her. However, at her request, he arranged for the Army to begin paying the benefit directly to her. The Army required that he state the benefit to be paid in a specific dollar amount, not a percentage, and John directed that the dollar amount be $1,211.30 by letter of February 18, 1985. However, John's net benefits increased at least eight times, beginning in June of 1985, and eventually resulting in his receiving a monthly benefit of $3,258.90 by March of 1990. John never notified Anna of the increases or took any steps to have the Army increase the amount of his benefits Anna was receiving.
One of the increases John received in payments from the army was due to the Army's cancellation of the Survivor's Benefit Plan which John had agreed in the decree to provide for Anna. Apparently, under the regulations set up by the Army, Anna no longer qualified for the plan because of the divorce. When the plan was cancelled by the Army, they refunded $2,200 in premiums already deducted from John's retirement checks and increased the amount sent to John each month by $322.50. Again, John did not notify Anna that her coverage under the plan had been cancelled or of the fact that he now received more than she was receiving, i.e., she no longer was receiving her one-half of his net retirement benefits. John did not share the $2,200 refund with Anna. When asked why he did not give Anna what she was due under the terms of the decree, John said that he was in great need of the additional money and knew that she was living well.
Anna did not find out about the cancellation of the survivor's benefit plan until August of 1990, after John filed the complaint to modify. Apparently, she also did not learn that John had been receiving more of the Army retirement until then. However, Anna did not live up to the letter of the decree and "property settlement" either. She received $101,768.89 from her father on June 13, 1985, in order to buy a house and did not report this to John. However, she claimed that the money was a loan from her father, Earnest R. Anthis, to enable her to move from Greenville, where she and John had lived, back to Muskogee, Oklahoma, where her elderly parents lived, and that she paid her father back.
In addition, between March of 1987 and April of 1989, Anna received gifts of cash and certificates of deposit from various members of her family in the amount of $99,000. Between July of 1986 and July of 1987, she received shares of stock from her father worth approximately $17,000. She received a check for $5,000 from the Earnest R. Anthis Trust on October 20, 1989. On December 23, 1986, she received a quit-claim deed to a mineral interest from the same trust. The mineral interest eventually produced up to $1,100 a month in royalties to her. After her father's death in August of 1989, Anna received $51,000 in stocks from her father's estate and other family members, and she stood to inherit one-fourth (1/4) of her father's estate of $511,000, which had not been distributed at *Page 751 
the time of the trial. None of these transactions were reported to John Brennan until after Anna received a letter dated March 11, 1990, from John's attorney.
Financial Status of the Parties
At the time of the divorce, John worked as the Director of the Port of Greenville at a salary of $46,761 and also drew his Army retirement. However, his position was eliminated at the end of September, 1985 and he had not been able to find other employment through the time of the modification hearing. John testified that he had made applications and interviewed for at least eight jobs during the period between leaving his old job and 1987, when he applied for early Social Security benefits at age 62. John's income after the payments to Anna were deducted for the years 1985 through 1989, as reflected on his federal income tax returns was: 1985 — $59,663; 1986 — $40,711; 1987 — $45,208; 1988 — $18,677; 1989 — $30,180. At the time of the trial, John's only income came from his share of the military retirement of $3,258.90 per month and the social security payments of $704 per month.
A "Financial Statement" submitted into evidence by John listed his net worth as $59,723.32 considering assets of $155,220.97 and liabilities of $95,723.32. His monthly expenses included a $900 mortgage payment, $500 home equity loan payments, $600 payments on credit cards, $50 for lawn care and maintenance, $150 for medical care, $400 for food and various other expenses which all totalled $3,732 a month. He testified that he also belonged to the country club, presumably at some monthly expense. Major costs he had incurred prior to the trial were $2,500 for cataract removal and eye lens implants and $1,900 to paint his house.
Anna Brennan has at no time relevant to this case been employed. The only income she has received has been the portion of John's retirement benefits and gifts received from members of her family, and income derived from those gifts, such as interest and mineral royalties. Her income for 1985 through 1989, as reflected on her federal income tax returns, was: 1985 — $8,157; 1986 — $5,412; 1987 — $14,707; 1988 — $15,913; 1989 — $20,728. It should be noted here that these amounts do not include the approximately $14,535.60 in annual payments received annually from John's retirement, which she did not include as taxable income, presumably because it comes from a "property settlement." The financial statement Anna submitted to the court listed assets of $595,703.09 and liabilities of $109,900, for a net worth of $485,803.09.
Anna's monthly expenses included $862 in payments on loans, $300 for maintenance on her home, $400 for food and supplies and various other expenses that amount to $3,217.95. At the time of the trial, she had just moved from the home she bought when she first moved to Muskogee into a larger home on the same street. She stated that she intended to sell the old house for approximately $73,500 due to repairs needed and the depressed real estate market in Muskogee.
 LAW I. DID THE LOWER COURT ERR IN DENYING THE MOTION FOR A CITATION OF CONTEMPT BASED ON EQUITABLE ESTOPPEL AND UNCLEAN HANDS? A.
Anna contends that the lower court erred in finding that she was equitably estoppel for two reasons: (1) estoppel was not pled specifically as an affirmative defense and, (2) the elements of estoppel were not shown by John.
In Sumrall v. Doggett, 511 So.2d 908, 910 (Miss. 1987), the Court held that estoppel was an affirmative defense which must be pled by the party asserting it and cited Miss.R.Civ.Proc. 8(c), which states "In pleading to a preceding pleading, a party shall set forth affirmatively . . . estoppel . . ." and other affirmative defenses. The case at bar went to trial on the motion setting up estoppel and we do not hold that John's failure to plead the defense bars it. The following argument by John's counsel, *Page 752 
without question, should have placed Anna on notice that the question of estoppel was being injected into the hearing: "the inference to be drawn from all of this is that she wasn't thinking about telling Colonel Brennan until she had to because I'm sure she felt like she was fixing to lose twelve hundred and something dollars a month and why not go on and ride it out and stonewall it as long as you can and collect it and get it in the bank and then have the question raised."
The essential elements of equitable estoppel are:
 Conduct and acts, language or silence, amounting to a representation or concealment of material facts, with knowledge or imputed knowledge of such facts, with the intent that the representation or silence, or concealment be relied upon, with the other party's ignorance of the true facts, and reliance to his damage upon the representation or silence.
Chapman v. Chapman, 473 So.2d 467, 470 (Miss. 1985) (quotingCrow v. Fotiades, 224 Miss. 422, 80 So.2d 478, 486 (1955)).
We are of the opinion that the lower court easily could have found that Anna did not notify John about receiving the gifts as directed by the earlier decree, thereby concealing the gifts from his knowledge; that he could have found her intent was to prevent John from filing a modification petition based on the changed circumstances as contemplated in the decree; and that the lower court could have found that John did not know of the gifts despite his admissions that he knew Anna was living well.
 B.
Anna contends that the lower court was in error when it held that the unclean hands doctrine precluded a finding for Anna on the contempt issue.
The Chancellor's order confirms that the denial of relief to Anna was based, primarily, on the maxim of equity that "[h]e who comes into equity must come with clean hands." Thigpen v.Kennedy, 238 So.2d 744, 746 (Miss. 1970).
O'Neill v. O'Neill, 551 So.2d 228, 233 (Miss. 1989) holds that "[t]he meaning of this maxim is to declare that `no person as a complaining party can have the aid of a court of equity when his conduct with respect to the transaction in question has been characterized by wilful inequity. . . .'" (quoting V.A. Griffith,Mississippi Chancery Practice, § 42 (2d ed. 1950).
In Thigpen, supra, the Court approved the following description of the maxim in the words of Pomeroy:
 [W]henever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." Vol. 1 Pomeroy's Equity Jurisprudence, 4th Ed., Section 397, page 738.
Thigpen v. Kennedy, 238 So.2d 744, 746 (Miss. 1970) (quoting from Patterson v. Koernor, 220 Miss. 590, 594, 595,71 So.2d 464, 466 (1954)). The maxim should be applied by the court sua sponte where it is shown to be applicable. Pearson v. Pearson,458 So.2d 711, 713 (Miss. 1984); Cole v. Hood, 371 So.2d 861, 864 (Miss. 1979); Thigpen, supra, 238 So.2d at 746-747 (citingGriffith, § 42).
The lower court found that Anna did not notify John of the gifts she had received from family members until May 29, 1990, after she received the letter from John's attorney. The record indicates that the lower court was compelled to make this finding from Anna's own testimony. We are of the opinion that the chancellor did not abuse his discretion and was not manifestly wrong in applying the maxim of unclean hands to Anna's claim for contempt against John because of his failure to perform the terms of the decree.
The judgment of the lower court is affirmed on direct appeal.
 CROSS-APPEAL I. DID THE LOWER COURT ERR IN FINDING THAT JOHN HAD FAILED *Page 753 
TO PROVE A MATERIAL CHANGE IN CIRCUMSTANCES JUSTIFYING MODIFICATION OF THE ORIGINAL DECREE.
The lower court dismissed John Brennan's petition for modification, relying upon Hooker v. Hooker, 205 So.2d 276, 278 (Miss. 1967), wherein this Court again stated the rule that "Conversely, a husband may not petition for modification of the original decree without showing either that he has performed it or that his performance has been wholly impossible". Id. at 278.
In Mullen v. Mullen, 246 So.2d 923, 924 (Miss. 1971) and inKincaid v. Kincaid, 213 Miss. 451, 57 So.2d 263 (1952), this Court held that "for a modification of the original decree for support money, petitioner must show that he has performed it, or that its performance had been wholly impossible". The principles were reaffirmed in Gregg v. Montgomery, 587 So.2d 928 (Miss. 1991).
The "unclean hands" maxim applies to John's petition for modification as well as it does Anna's motion for contempt.
On December 26, 1990, the lower court entered a final order incorporating the court's ruling and findings of fact dated December 14, 1990, and dismissed the petitions of Anna and John. We affirm the judgment of the lower court in those respects but hold that by the entry of the final judgment, the lower court cleansed the hands of the parties and that from and after the date of the final decree, the matter of modification of the previous divorce decree dated October 25, 1984, may be revived in this case and the cause is remanded to the lower court for that purpose.
AFFIRMED ON DIRECT APPEAL. REMANDED ON CROSS-APPEAL.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.