968 So.2d 961 (2007)
Martin HOWARD, Jr., Appellant
v.
Teresa HOWARD, Appellee.
No. 2006-CA-00350-COA.
Court of Appeals of Mississippi.
November 13, 2007.
*964 John R. Reeves, John Justin King, attorneys for appellant.
Wayne Smith, Liberty, attorney for appellee.
Before LEE, P.J., IRVING and CHANDLER, JJ.
*965 CHANDLER, J., for the Court.
¶ 1. This appeal is the second time this child support modification case has been before the Court. In Howard v. Howard, 913 So.2d 1030 (Miss.Ct.App.2005), we reversed the denial of Martin Howard, Jr.'s petition for modification of child support by the Chancery Court of Pike County and remanded for reconsideration. After hearing more evidence on remand, the chancellor dismissed the modification petition. Now, Martin appeals, arguing that the chancellor erred by dismissing the petition for modification on the bases of res judicata and unclean hands, by finding him in contempt of court, and by awarding attorney's fees to his ex-wife, Teresa Howard.
¶ 2. We find that the chancellor erroneously found that the matter of Martin's disability from employment as a surgeon was barred from consideration by the doctrine of res judicata. We reverse and remand for the chancellor to reconsider the issue of modification. We affirm the chancellor's finding of contempt and the award of attorney's fees to Teresa.

FACTS AND PROCEDURAL HISTORY
¶ 3. The following facts were taken from our prior opinion in this case and from the record of the proceedings before the chancery court on remand. The parties were divorced in 1995 by a decree of the Chancery Court of Pike County. On November 17, 2000, the court increased Martin's child support obligations for his three children from $2,100 per month to $2,500 per month. The court also ordered Martin to make the monthly mortgage payment on the home of Teresa and the children and to pay the children's reasonable educational expenses. All of these obligations totaled $5,100 per month. At that time, Martin worked as a general surgeon and had an income exceeding $200,000 annually.
¶ 4. Martin filed a petition for modification of child support on June 13, 2001. He alleged that there had been a material change in circumstances due to an injury to his hand that had foreclosed his ability to perform surgery, resulting in a reduction in income. Teresa opposed the petition, and a hearing occurred on October 30, 2001. In our prior opinion, this Court summarized the evidence adduced at the October 30, 2001 hearing:
Martin testified that following carpal tunnel release in November 2000, his dexterity decreased and he had difficulty holding objects. In April 2001, he took a medical leave of absence and consulted with Dr. Aubrey Lucas, an orthopaedic surgeon who specialized in hand surgery. Dr. Lucas testified by way of deposition; his office notes were attached as an exhibit. Following his initial examination of Martin on April 27, 2001, Dr. Lucas referred him to a neurologist for a nerve conduction study, an anesthesiologist for pain management, and to an occupational therapist for strength, range of motion and sensation measurement. Upon reviewing the results of these examinations, Dr. Lucas recommended continued evaluation by the pain management specialist and a return to Dr. Lucas in two weeks. Martin did not return. Three months later, he telephoned Dr. Lucas advising that he had made plans to start a pathology residency at the University of South Alabama in the next few weeks due to his inability to hold laparoscopic instruments for more than one to two minutes without significant pain and numbness. He asked Dr. Lucas to give a deposition for use in chancery court proceedings and made an appointment for Dr. Lucas to update his condition before the deposition. On August 28, Dr. Lucas detected no visible abnormalities with Martin's hands and found the range of motion to *966 be good. Dr. Lucas recommended that "if his condition does not improve and if he still feels unable to practice as a general surgeon, I would recommend a 2nd opinion regarding that issue. . . ." In response to a request for information from Martin's disability insurer, Dr. Lucas wrote, on September 12:
Martin has plans to complete a pathology residency and does not have plans to return to his normal practice of general surgery which included laparoscopic procedures. At this current time Martin is under restrictions that would not allow him to hold the laparoscope for extended periods of time. I discussed with Martin that if his condition continues to provide problems related to using the laparoscopic equipment and to returning to normal employment as a general surgeon, I would recommend a 2nd opinion regarding this issue. . . . At this time Martin has not been released to his regular occupation. He has been released to perform the office or clinic component of his surgical occupation and has been free to do so since I originally saw Martin on 4-27-01. The medical restrictions to avoid the use of the laparoscope will be in effect until 12-1-01. I hope at that time to either hear from Martin that he can return or to obtain a 2nd opinion regarding this issue.
Dr. Lucas testified that while Martin could perform some simple surgical procedures, he could not perform the laparoscopic component of his practice which, according to the history, was the majority of his practice. When asked whether there was a need for Martin to change occupations at that time, Dr. Lucas responded "[a]t this point and (sic) time, there were probably many personal reasons that I don't feel that I should be in the middle of. . . . As far as physical reasons for changing occupations, I would say it's premature. But, he might have many reasons he's factoring in." (emphasis added).
Howard, 913 So.2d at 1033-34(¶ 4). In a footnote, the Court related Dr. Lucas's testimony that, on August 28, Martin had discussed several issues "outside normal discussions about his hand" including child support and uncontrolled rage, and that Dr. Lucas had recommended that Martin consult a psychologist or psychiatrist. Id. at 1034 n. 2.
¶ 5. On November 2, 2001, the chancery court issued a letter opinion denying Martin's petition for modification. The chancellor found that no vocational evidence supported Martin's position. Rather, the chancellor found "strong evidence from Dr. Lucas that Martin was motivated to make a change by considerations other than his medical condition." The chancellor found that all the evidence showed that "Martin was, at the least, premature in the decision to abandon his career as a surgeon." The chancellor found that Martin, despite his knowledge of his court-ordered obligations, had voluntarily worsened his financial position so that he could not meet those obligations. For that reason, the chancellor held he was not entitled to a reduction in support pursuant to Parker v. Parker, 645 So.2d 1327, 1331 (Miss.1994). The chancellor stated that "Martin must accept responsibility for that ill-timed and ill-advised decision that was at best premature." The chancellor also found that Martin was before the court with unclean hands because he had failed to perform his obligations or show his inability to perform. The chancellor noted that, while Martin claimed to be in great pain, he continued to play golf regularly.
¶ 6. Martin did not appeal from the November *967 2, 2001 judgment.[1] On two occasions in 2002, the chancery court held Martin in contempt for nonpayment of the mortgage, child support, and educational expenses. On both occasions, the court ordered that Martin be incarcerated until he purged himself of contempt by paying all the amounts owed. Martin was arrested on January 14, 2003. On January 16, 2003, he filed the instant motion to suspend/modify his support obligation. He argued that he had no money, had exhausted his liquid assets, was unable to practice medicine as a surgeon because of a medical disability which was beyond his control, and was earning only $3,000 per month as a pathology resident. On January 17, 2003, Teresa filed a motion for citation of contempt, claiming that Martin was in contempt of his continuing obligations under the prior court orders. The court ordered that Martin could be released from incarceration on a cash bond of $36,500. Martin paid that amount and was released.
¶ 7. On April 17, 2003, a hearing occurred on Martin's petition for modification of child support and Teresa's motion for contempt. In our prior opinion, we related the evidence introduced at the April 17, 2003 hearing:
The parties stipulated that Martin's arrearage as of April 17, 2003 was $100,620.43. Teresa testified that she works approximately thirty hours a week and last year made $15,900, which was insufficient to cover her house payments. She has borrowed money from her family and inherited part of a small estate of her father. Teresa testified that while she has considered moving into a different home with a lower monthly note, she did not qualify for other loans because of the negative liens on her credit report that Martin had failed to clear up previously. Teresa testified that the minimum amount she needed in order to make ends meet considering the children's educational expenses, insurance, clothing, food, and housing was $2,500 per month.
Martin admitted that he had unilaterally reduced his child support payments from $2,500 to $500 per month but had not even paid Teresa that amount since his release from jail. Martin testified that it was his understanding that he was incarcerated because of past due child support payments and that when he paid the amount set by the court for his release, that he had paid all the past-due child support plus an extra amount which had him current until the middle of the summer. He testified that he has been paying the $500 he would normally pay to Teresa to his brother-in-law in partial repayment of the amount he borrowed to secure his release from jail. Martin testified, "that was my misunderstanding completely."
As to the requested modification, Martin testified that he was continuing his medical education to become a pathologist because it is one of the few fields of medicine left open to him without the use of his right hand for fine motor skills; his salary as a second year resident was $37,500. He reported that *968 the malpractice coverage for his surgical career had been cancelled due to the number of claims which had been filed; he testified that he was currently litigating six malpractice claims. While Martin testified that he was currently seeing three different physicians, he did not call any of them as witnesses to support his contention regarding inability to perform surgery. He testified that he anticipated completion of his residency in September 2005 and that his salary as an entry level pathologist should be approximately $150,000.
Id. at 1035-36 (¶¶ 9-11).
¶ 8. Following the hearing, the chancery court issued a letter opinion and then an amended opinion on Teresa's motion for reconsideration. The court issued the letter opinion on April 22, 2003. The court found that the issue of modification due to Martin's drop in income had previously been determined adversely to Martin in the November 2, 2001 order. The court held that Martin did not appear before the court with clean hands in light of his failure to pay any amount toward his court-ordered obligations since January 2003. The court found that, while the "realities of the drop" in Martin's income were "evident," Martin had "not taken reasonable steps to try to correct" the matter. The court determined that, while Martin was not entitled to modification, his obligations should be reduced to $2,500 per month, with the remaining monthly sums due to continue to accrue but to be held in abeyance. Martin's failure to pay the abated amounts would not constitute contempt. On May 19, 2003, the court entered a final judgment incorporating the letter opinion and decreeing Martin to be in arrears in the amount of $100,620.43, to bear interest at the legal rate of eight percent per annum, to be in willful contempt of the court's prior orders, and to be incarcerated for this contempt unless he paid Teresa $10,000 within twenty-one days.
¶ 9. In the amended opinion on July 2, 2003, the chancellor granted Teresa's motion for reconsideration. In a bench opinion, the chancellor stated:
it was error for me to allow Dr. Howard to reduce his child support. By way of explanation, Dr. Howard approached the court on a motion to modify . . . regarding his claim that he was no longer able to practice as a general surgeon. The court found that position to not be substantiated, that he had elected to withdraw from the surgical field and his own treating physician didn't support that position at the time he made it. The court ruled on this matter on April 22d. I was attempting to address the information that I had and apply it to the difficult case where Dr. Howard now claims that he only had an income of approximately $3,000 a month in his pathology residency at the University of South Alabama. . . . But the court, I believe, committed error in making that determination on April 22d. The realities are that apparently Dr. Howard's income is that amount. However, that was the same defense and position he had taken and the court had previously ruled on that. So, in essence the law of the case in this particular instance is controlling, and the court has previously ruled and denied that relief, and, therefore, the court erred in making that determination and I now reverse that ruling and reinstate the provisions that existed immediately prior to the April 22d, 2003 ruling and the order that followed that ruling.
¶ 10. Martin appealed, and in our decision on May 10, 2005, we reversed and remanded the case for reconsideration of the modification issue. Id. at 1043(¶ 30). We found that the chancellor had denied *969 the petition for modification of child support for three reasons: (1) the court already had considered Martin's position in 2001, (2) Martin had come into court with unclean hands, and (3) Martin had failed to take reasonable steps to correct his financial situation. Id. at 1040(¶ 23). We held that, contrary to the chancellor's finding, the first two reasons did not preclude modification. Id. at (¶ 22). Regarding the first reason, we observed that a child support decree is "never final" and is subject to modification when there has been a material change in circumstances. Id. at 1040-41(¶ 23) (citing Reno v. Reno, 253 Miss. 465, 472-73, 176 So.2d 58, 61 (1965)). We recognized that, while Martin was precluded from relitigating a claim that was brought or could have been brought in his original petition to modify, Martin was "not precluded from showing a material change in circumstances occurring subsequent to the November 2001 opinion." Id. at 1041(¶ 24). Therefore, "the chancery court should have considered any evidence of events occurring subsequent to the November 2001 opinion to determine whether a substantial and material change had occurred justifying modification of Martin's support obligations." Id. We indicated that the chancellor could consider "whether, by April 2003, a material change in circumstances had occurred which converted Martin's `premature' decision into [one] no longer under his control." Id. at 1042(¶ 27).
¶ 11. Concerning the issue of unclean hands, we found that the facts substantially supported the chancellor's finding that Martin had come into court with unclean hands. Id. at 1043(¶ 27). However, we held that this fact did not preclude the chancellor's consideration of Martin's petition to modify because the entry of final judgment of total arrearage cleansed Martin's hands and revived the issue of modification. Id. at 1043(¶ 28). The chancellor's last reason for denying the petition for modification was the finding that Martin had not taken reasonable steps to correct his financial situation. Id. at 1043(¶ 29). We held that this finding was supported by the evidence; however, we were unable to determine whether the third reason, without more, would have caused the chancellor to deny modification. Id. We stated that "[t]he chancellor's concern over the `realities' of Martin's reduction of income and the court's attempt to alleviate part of Martin's monetary burden, even temporarily, leads us to believe that the chancellor may have ruled differently had the other two reasons for denying modification not been present." Id. As we held that the other two reasons did not preclude modification, we reversed and remanded to the chancery court for reconsideration of the matter of modification. Id. We noted Dr. Lucas's opinion directing Martin to seek a second opinion if he had problems returning to surgery in December 2001, and we recognized that the chancery court possessed discretion to require a second opinion on remand. Id. at 1044(¶ 30).
¶ 12. On remand, a new chancellor heard evidence at a bifurcated hearing held on October 21, 2005 and December 16, 2005. The issues before the court were Martin's petition for modification and Teresa's latest petition for citation of contempt for Martin's continued non-payment of sums ordered by the court. At these hearings, the chancellor had the parties reintroduce any desired evidence from the April 17, 2003 hearing and also allowed them to present new evidence as to what had occurred after that hearing. It was established that, by this time, two of the parties' children were enrolled at Mississippi College and the third was attending high school at Parklane Academy.
¶ 13. On October 21, 2005, Martin testified that he had completed his pathology *970 residency and was employed at the Pathology Laboratory in Lake Charles, Louisiana at a salary of $144,000 per year. Martin stated that the Pathology Laboratory had temporarily closed due to damage caused by Hurricane Rita, which struck Lake Charles earlier that month. Martin said that he was still being paid by the Pathology Laboratory and he was scheduled to take an exam to become board certified in pathology. Teresa collected some child support from Martin during 2005 through the child support collection unit of the Mississippi Department of Human Services.
¶ 14. On December 16, 2005, Martin explained that he was no longer employed by the Pathology Laboratory, having quit because, as the last person to be hired, he was afraid of being terminated due to the laboratory's decline in business after the hurricane. Martin stated that he was now working for the University of Mississippi Medical Center (UMMC) in Jackson at an annual salary of $124,000 per year. Martin admitted that he had been in negotiations with UMMC at the time of the October 21, 2005 hearing. He had also purchased a house located on a golf course for approximately $194,000 and continued to play golf with some regularity.
¶ 15. There was evidence that Martin was rated as a general surgeon with the United States National Guard. He was deployed to Iraq from January 2004 to April 2004. Martin stated that he was incorrectly rated as a general surgeon; he testified that he acted as a general medical officer in the National Guard and never performed general surgery.
¶ 16. The chancellor reviewed medical evidence consisting of the depositions of Dr. Frederick N. Meyer, an orthopaedic surgeon with a subspecialty in hand surgery, and Dr. Joseph Farina, a neurologist. Dr. Farina's deposition indicated that Martin had not consulted Dr. Farina as a patient in a clinical setting, but had worked with Dr. Farina and asked for his medical opinion informally as a colleague. Dr. Farina stated that he examined Martin's hand on about five occasions. According to Dr. Farina, Martin had exhibited carpal tunnel symptoms as early as 1996 and had objective signs of reflex sympathetic dystrophy (RSD) following the carpal tunnel release surgery. He opined to a reasonable degree of medical certainty that Martin could not work as a general surgeon.
¶ 17. Dr. Meyer saw Martin initially on November 20, 2001. Martin complained of severe pain and numbness in his right hand that had begun two weeks after his carpal tunnel release in November 2000. Dr. Meyer prescribed aggressive physical therapy. By December 11, 2001, Martin had improved significantly. On January 28, 2002, Dr. Meyer felt that Martin's problem was RSD in the right hand, a complication of carpal tunnel release surgery. Dr. Meyer described RSD as a nerve disorder that causes pain and other symptoms, such as sweating and changes in skin color and temperature. Dr. Meyer observed that Martin exhibited these symptoms.
¶ 18. On November 1, 2002, Dr. Meyer diagnosed Martin with left-sided carpal tunnel syndrome and prescribed a splint for his left hand. A December 2002 bone scan showed that Martin had developed osteoarthritis in both wrists. On February 10, 2003, Dr. Meyer determined that Martin had a nine millimeter two point discrimination between the thumb and index finger, a measure of touch sensitivity which showed he was in the moderate range for impaired nerve function in the right hand. An electromyogram (EMG) indicated nerve damage to the right hand. *971 In 2003, Martin still reported problems with holding objects and performing fine manipulation. Dr. Meyer last saw Martin on March 18, 2003, after which Martin did not return.
¶ 19. Dr. Meyer testified that, to a reasonable degree of medical certainty, Martin was impaired from performing surgery due to difficulty feeling things and handling fine objects. Dr. Meyer attributed this impairment to several problems, including RSD, which Dr. Meyer noted was objectively supported by the EMG and caused decreased motion and strength; carpal tunnel syndrome, which made it hard to handle objects and perform fine manipulations; the drop in nerve function; and arthritis of the CMC joint. Dr. Meyer stated that, from the level of functioning shown by Martin's pre-operative EMG, Martin had been disabled from performing surgery since before his carpal tunnel release surgery. Dr. Meyer said that, until two weeks before the deposition, he had not known that Martin was involved in litigation concerning his hand condition.
¶ 20. In her findings of fact and conclusions of law, the chancellor found that the evidence introduced on April 17, 2003 was such that the chancellor should have denied Martin's petition for modification solely upon Martin's failure to take reasonable steps to correct his financial situation. The court found that the record at that time clearly showed that Martin's income reduction was voluntary and lacked the support of medical advice.
¶ 21. The chancellor then determined that Martin was not entitled to a modification based on the facts and circumstances as they existed on December 16, 2005, which included the opinions of Drs. Farina and Meyer. The chancellor found that carpal tunnel syndrome was the same condition Martin had asserted to justify a reduction on October 30, 2001, and would be res judicata unless Martin showed a worsening of the condition that disabled him from practicing surgery. In her review of the medical evidence, the chancellor noted that Dr. Farina had observed carpal tunnel problems in Martin's right hand in 1996. The chancellor held that res judicata barred consideration of Dr. Farina's opinion because Martin had mentioned Dr. Farina at the October 2001 hearing and most of Dr. Farina's visits with Martin predated that hearing.
¶ 22. Concerning Dr. Meyer's opinion, the court stated, "Dr. Meyer's testimony, in toto, relates that Dr. Meyer's opinion, based on medical tests and charts from examinations prior to the time that Martin sought his advice, as contrasted by the examinations of Dr. Meyer and tests ordered by him, establish an impairment which would probably affect Martin's surgical ability but that the date of onset was prior to the November 2000 surgery." The court found that Martin's condition continuously improved during the course of Dr. Meyer's treatment. Based on its finding that no worsening had occurred, the court concluded, "the issue of Martin's impairment related to carpal tunnel syndrome (whether the successful or failed `release' operation and ensuing RSD and widened two-point discrimination noted by Dr. Meyer) and its effect on his ability to carry on his prior occupation are foreclosed from consideration by this court to justify modification under the doctrine of res judicata." Citing Mississippi Department of Human Services v. Shelby, 802 So.2d 89 (Miss.2001), the chancellor found that the four identities of res judicata were met and that the grounds for relief asserted by Martin were previously litigated at the October 30, 2001 proceeding. Additionally, the court found that Martin had not shown a material change in circumstances since October 2001, that he was guilty of a *972 continued failure to take reasonable steps to correct his financial situation, that he had misrepresented his assets to the court, and that he had voluntarily worsened his financial position. The court also found Martin had unclean hands and was in willful contempt of court for his failure to pay sums due under prior court orders, more about which shall be discussed below.

STANDARD OF REVIEW
¶ 23. This Court's review of chancery court decisions in domestic relations matters is limited. Townsend v. Townsend, 859 So.2d 370, 372(¶ 7) (Miss.2003). We will affirm the decision of the chancellor when supported by substantial evidence, unless the chancellor abused her discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard. Chapel v. Chapel, 876 So.2d 290, 293(¶ 8) (Miss.2004). We review questions of law de novo. Townsend, 859 So.2d at 372(¶ 7).

LAW AND ANALYSIS
I. WHETHER THE CHANCELLOR ERRED BY DENYING MARTIN'S REQUEST FOR MODIFICATION.
¶ 24. "The underlying principle regarding child support is the legal duty owed by the parents to the child for the child's maintenance and best interests." Adams v. Adams, 467 So.2d 211, 215 (Miss.1985). Though child support payments are made to the custodial parent, the payments are for the benefit of the child. Id. Our law requires each spouse to "provide financially for his or her children, given his or her resources and opportunities." Cumberland v. Cumberland, 564 So.2d 839, 845 (Miss.1990). A child custody judgment is res judicata and conclusive of the facts and the rights of the parties existing at the time it was entered. Reno, 253 Miss. at 472-73, 176 So.2d at 61. However, a child support judgment is, in a sense, never final because the judgment is modifiable if a material change in circumstances occurred after the decree. Id. The change must be one that cannot have been reasonably anticipated at the time of the original decree and one that reasonably affects the parties' ability to abide by the original decree. Poole v. Poole, 701 So.2d 813, 818 (¶¶ 19, 21) (Miss.1997). The court may consider the parties' relative financial condition and earning capacities in determining whether a material change in circumstances has occurred. Bailey v. Bailey, 724 So.2d 335, 337(¶ 7) (Miss.1998).
¶ 25. While usually a spouse's actual income is assessed in determining the amount of child support, income will be imputed to a child support payor who, in bad faith, voluntarily worsens his financial position. Parker, 645 So.2d at 1331. The payor need not harbor an express intent to harm the children; bad faith may be found when a payor effectively compromises the children's interests by voluntarily terminating his employment. Bailey, 724 So.2d at 338(¶ 9). However, income will not be imputed to a payor who establishes a reduced earning capacity due to matters beyond the payor's control. For example, in Kennedy v. Kennedy, 650 So.2d 1362, 1368 (Miss.1995), a spouse was entitled to a reduction in separate maintenance payments because he retired from employment as a roustabout due to injuries that left him unable to do the job.
¶ 26. Martin argues that the chancellor erred in her application of the doctrine of res judicata. He points out that, because the terms of a child support order are inherently modifiable upon a showing of a material change in circumstances, the issue of whether or not Martin could engage in the practice of surgery was not finally settled by the November 2, 2001 letter *973 opinion of the court. He contends that our prior opinion clarified that the chancellor was to consider any evidence arising subsequent to the November 2, 2001 letter opinion. Martin urges that the medical opinions to the effect that Martin's hand problems have rendered him unable to practice surgery constitute additional facts that arose after November 2, 2001.
¶ 27. Res judicata precludes a party from litigating claims that were raised or could have been raised by the party's prior child support modification petition. Shelby, 802 So.2d at 95(¶ 24) (citing Aetna Cas. & Sur. Co. v. Berry, 669 So.2d 56, 67 (Miss.1996) (overruled in part on other grounds)). Four identities must be present before a subsequent action may be dismissed on the basis of res judicata:
(1) identity of the subject matter of the original action when compared with the action now sought to be precluded; (2) identity of underlying facts and circumstances upon which a claim is asserted and relief sought in the two actions; (3) identity of the parties to the two actions, and identity met where a party to the one action was in privity with a party to the other; and (4) identity of the quality or character of a person against whom the claim is made.
Id. If the four identities are present, a party may not raise a claim in a subsequent action. Id. "This is true regardless of whether all grounds for possible recovery were litigated or asserted in the prior action, as long as those grounds were available to a party and should have been asserted." Id. The related bar of collateral estoppel prevents the parties from relitigating a specific issue actually litigated and determined by the prior action and essential to the judgment, even though the subsequent action involves a different cause of action. Aetna Cas. & Sur. Co., 669 So.2d at 67.
¶ 28. Two cases exemplify the application of these concepts to a party's subsequent petition for child support modification. In Shelby, the custodial parent, Sharen Davis, filed a motion to modify child support in April 1998 based upon her ex-spouse's new job. Shelby, 802 So.2d at 91(¶ 6). In August 1999, the Mississippi Department of Human Services filed a complaint for support and other relief on Davis's behalf. Id. at 91-92 (¶¶ 7-8). This complaint included a claim that a material change in circumstances had occurred because Davis sold the marital residence in April 1997. Id. at 96(¶ 27). The court held that the issue of whether the sale of the marital residence was a material change in circumstances justifying a child support modification was precluded from consideration because it could have been presented in Davis's April 1998 motion to modify and, thus, was res judicata. Id. In Lane v. Lane, 850 So.2d 122, 125(¶ 6) (Miss.Ct.App.2002), we held that the issue of whether a child's emancipation was a material change in circumstances was precluded because that specific issue had been actually litigated and decided adversely to the ex-husband in the ex-husband's earlier petition for modification.
¶ 29. Applying these principles to the present case, Martin was precluded from relitigating any issue that was litigated or could have been litigated in the proceedings on his prior petition for modification that culminated in the letter opinion of November 2, 2001. At that prior proceeding, the evidence showed Martin had a carpal tunnel release surgery in November 2000. He maintained he was still experiencing problems which kept him from performing surgery. The chancellor held that Martin's decision to quit his surgical practice was voluntary because the only medical evidence was the opinion of Dr. Lucas that Martin's decision was premature and *974 he should seek a second opinion if he could not return to surgery by December 2001. Howard, 913 So.2d at 1034(¶ 4).
¶ 30. On remand, the new chancellor found that the issue of Martin's disability from his hand condition had been litigated to conclusion at the October 30, 2001 hearing and that the only way Martin could claim a material change in circumstances concerning the hand condition was to prove a physical worsening resulting in disability. This Court, in our May 10, 2005 opinion, extrapolated on the application of res judicata to the evidence on remand. We stated that the November 2, 2001 ruling "does not foreclose . . . a determination that by April 2003, the decision whether to practice surgery was no longer in Martin's hands, so to speak." Id. at 1040(¶ 23). Later, we indicated Martin could show that, "by April 2003, a material change in circumstances had occurred which converted Martin's `premature' decision into [one] no longer under his control." Id. at 1042(¶ 27). The court was to consider any evidence of events occurring subsequent to the November 2001 opinion to determine whether a substantial and material change had occurred justifying modification of Martin's support obligations. Id. at 1041(¶ 24). We specifically stated that this evidence could include a second opinion as to Martin's hand condition. Id. at 1044(¶ 30).
¶ 31. We look to the evidence after the November 2001 opinion that was introduced on remand. This evidence shows that, after the November 2, 2001 opinion, on November 20, 2001, Martin initially saw Dr. Meyer. Martin began physical therapy and experienced improvement. In January 2002, Dr. Meyer diagnosed him with RSD. In November 2002, Dr. Meyer diagnosed him with left-sided carpal tunnel syndrome, and in December 2002 with osteoarthritis in both wrists. In February 2003, Dr. Meyer performed tests showing Martin had moderate nerve damage to the right hand. When Dr. Meyer last saw Martin in March 2003, Martin still had problems with holding objects and performing fine manipulation. Dr. Meyer opined to a reasonable degree of medical certainty that Martin was disabled from performing surgery due to these conditions. However, Dr. Meyer said an EMG study taken before the November 2000 carpal tunnel release showed Martin's inability to perform surgery dated from that time.
¶ 32. We find that the chancellor erroneously determined that res judicata foreclosed this medical evidence from consideration. Certainly, the matters of the extent of Martin's disability on November 2, 2001 and his April 2001 decision to quit practicing surgery were res judicata and precluded from relitigation on his subsequent petition for modification. Martin could not, with his January 2003 modification petition, seek to have the chancellor reconsider these matters finally adjudicated on November 2, 2001. But, Martin was permitted to show with his subsequent modification petition that, though his decision not to practice surgery was voluntary on November 2, 2001, surgical practice was no longer an option for him. Howard, 913 So.2d at 1040(¶ 23). In fact, Dr. Meyer's deposition was probative of the extent of Martin's control over his ability to practice surgery after November 20, 2001. While, as the chancellor found, Martin's physical condition improved over the course of his treatment by Dr. Meyer, Martin left Dr. Meyer in March 2003 still experiencing problems with holding objects and fine manipulation due to a variety of new medical problems and it was Dr. Meyer's opinion that Martin could not practice surgery. This opinion was based on objective medical testing and diagnosis of the new medical problems rendered after the November *975 2, 2001 opinion. The fact that Dr. Meyer thought Martin's carpal tunnel syndrome disabled him from practicing surgery before his November 2000 carpal tunnel release surgery did not preclude the chancellor's consideration of Dr. Meyer's opinion that the newly-diagnosed RSD, left-sided carpal tunnel syndrome, osteoarthritis, continuing right-sided carpal tunnel symptoms, and moderate nerve damage were the conditions preventing him from performing surgery in March 2003. The November 2, 2001 opinion and judgment did not foreclose Martin from demonstrating that Dr. Meyer's new assessment of his hand condition was a material change in circumstances justifying a reduction in child support.
¶ 33. Having determined that the chancellor erred by finding res judicata prevented consideration of the opinion of Dr. Meyer that Martin was disabled from practicing surgery, this Court is placed in a position similar to the one we faced in our May 10, 2005 opinion. The chancellor's opinion reveals that she dismissed the modification petition for four reasons, one of which was res judicata. The second was that Martin had not proven a material change in circumstances, the third was that Martin had failed to take reasonable steps to correct his financial situation, and the fourth was that Martin came into court with unclean hands. The second and third reasons were intertwined with the chancellor's determination that Dr. Meyer's opinion could not be considered as evidence of a material change in circumstances. The chancellor did state that Dr. Meyer's opinion "establish[ed] an impairment that would probably affect Martin's surgical ability." This statement indicates that the chancellor's finding on the issue of a material change in circumstances might have been different had the chancellor not found Dr. Meyer's opinion to be foreclosed from consideration by res judicata. For that reason, we reverse and remand this case for the chancellor to further consider the issue of modification. Nothing in this opinion should be construed as indicating how the chancellor should rule on remand. We are perpetually mindful that it is within the chancellor's sound discretion to determine the credibility of the witness testimony and what weight to ascribe to the evidence provided by those witnesses. Rogers v. Morin, 791 So.2d 815, 826(¶ 39) (Miss.2001) (quoting Carter v. Carter, 735 So.2d 1109, 1114(¶ 19) (Miss.Ct.App.1999)).
II. WHETHER THE CHANCELLOR ERRED BY FINDING THAT MARTIN HAD UNCLEAN HANDS.
¶ 34. In support of the holding that Martin was not entitled to modification, the chancellor found that Martin came into court with unclean hands. Martin argues this finding was contradicted by the evidence. "The clean hands doctrine prevents a complaining party from obtaining equitable relief in court when he is guilty of willful misconduct in the transaction at issue." Bailey, 724 So.2d at 337(¶ 6). Accordingly, a payor spouse who is currently in arrears may not obtain modification of his child support obligations unless the spouse proves that his performance was wholly impossible. Id. (citing Hooker v. Hooker, 205 So.2d 276, 278 (Miss.1967)). To show that performance was impossible, the payor must prove an inability to pay with particularity and not in general terms. Id. The payor must specifically prove that he was earning all he could, that he lived economically, and that he paid all surplus funds above living expenses toward the support obligation. Kincaid v. Kincaid, 213 Miss. 451, 456, 57 So.2d 263, 265 (1952).
¶ 35. Our resolution of this issue depends on the procedural posture of the case at the time of the judgment currently *976 under review. In our prior opinion, we affirmed the chancellor's finding that Martin had come into court with unclean hands. Howard, 913 So.2d at 1043(¶ 27). However, we concluded that, pursuant to Brennan v. Brennan, 605 So.2d 749, 753 (Miss.1992) and Lane v. Lane, 850 So.2d 122, 127(¶ 14) (Miss.Ct.App.2002), the court's May 19, 2003 order adjudicating the amount of Martin's total arrearage effectively cleansed Martin's hands and revived the issue of modification of Martin's child support obligations:
¶ 36. In Lane, the ex-husband in arrears had petitioned the court for modification. Lane, 850 So.2d at 124(¶ 4). The chancellor dismissed the petition pursuant to the doctrine of unclean hands, but also entered a judgment of total arrearage. Id. This Court, relying on Brennan, recognized that one who entered the court with unclean hands did not necessarily leave with unclean hands so as to preclude consideration of a pending modification petition until payment of the arrearage. Id. at 127(¶ 14). We held that the entry of a final judgment of arrearage cleansed the delinquent spouse's hands such that the modification issue was properly before the chancery court. Id. Therefore, we reversed and remanded for the court to determine the modification issue. Id.
¶ 37. Just as in Lane, in this case, we reversed and remanded for a determination of the modification issue because the issue had been revived by the chancellor's entry of a final judgment of total arrearage. Since that judgment was entered on May 19, 2003, the issue of modification of Martin's support obligation was revived as of May 19, 2003. The purpose of the remand was for the chancellor to adjudicate the modification issue. No new modification petition was before the court and the proceedings on remand simply were a continuation of the April 2003 proceedings instigated by Martin's January 16, 2003 petition for modification. Accordingly, the chancellor manifestly erred by again finding that the modification issue was barred from consideration by the unclean hands doctrine.
III. WHETHER THE CHANCELLOR ERRED BY FINDING MARTIN IN CONTEMPT.
¶ 38. After the prior appeal, Teresa filed several motions for citation of contempt. On April 18, 2005, the chancery court entered an order finding Martin to be in contempt for his failure to pay child support and the other court-ordered obligations in the amount of $254,427.27, plus attorney's fees. Martin did not appeal this order. On July 15, 2005, Teresa filed another motion for citation of contempt, and the issue was tried at the bifurcated hearing. The chancellor found that Martin had willfully and contemptuously refused to comply with prior court orders dealing with the arrearage and current support obligations, and that he was presently in arrears since the April 18, 2005 order in the amount of $37,165.67 for failure to pay the house note, private school tuition and expenses, college tuition, and child support. The chancellor assessed the total obligation, including arrearage, that was due and owing from Martin to Teresa as of December 16, 2005 at $292,479.94, to bear interest at eight percent per annum. Further, the chancellor ordered Martin to be incarcerated until he purged himself of contempt by paying $50,000 and thereafter kept his obligations current and made a good faith effort to reduce his arrearage.
¶ 39. Martin argues that he was entitled to a modification of his child support obligations as of April 2003. He argues that the question of whether he was in contempt for non-payment of his obligations after April 2003 is contingent upon *977 whether this court finds he was entitled to modification at that time. If he was relieved of his obligations retroactive to April 2003, he argues, he could not be in contempt for failure to meet those non-existent obligations. Martin further argues that the evidence failed to support the contempt finding.
¶ 40. We have already held that, on remand, the chancellor is to reconsider the modification issue. By arguing that any modification granted would retroactively apply to April 2003, Martin appears to contend that the proper date of modification would have been the April 17, 2003 hearing or the April 22, 2003 letter opinion that abated his child support obligation. We find that, if modification is granted on remand, the effective date of the modification shall be February 14, 2006, the date of the entry of the final judgment currently under review.
¶ 41. Child support payments vest in the child as they become due. Tanner v. Roland, 598 So.2d 783, 786 (Miss.1992). Each payment that becomes due and is unpaid becomes a judgment against the supporting parent. Id. A court cannot modify or forgive vested child support obligations. Id. Accordingly, when a payor moves for downward modification of child support, the payments due continue to vest during the pendency of the motion. Cumberland v. Cumberland, 564 So.2d 839, 847 (Miss.1990). Any modification granted will take effect on the date of the judgment granting the modification. Id. However, when an appellate court reverses and remands a child support modification appeal to the chancery court for redetermination of the issue, the effective date of any downward modification granted is the date of the judgment from which the appeal was taken. Setser v. Piazza, 644 So.2d 1211, 1216 (Miss.1994) (reversing and remanding the chancellor's denial of abatement of child support for further consideration and holding that the effective date of any downward modification granted would be the date of the order that erroneously denied modification.); Cook v. Whiddon, 866 So.2d 494, 500(¶ 22) (Miss. Ct.App.2004) (stating that the chancellor could make any order entered on remand that reduced child support retroactive to the effective date of the judgment cleansing the payor's hands and reviving the modification issue); Lane, 850 So.2d at 127(¶ 14) (noting that the Court was not at liberty to modify child support retroactively, and stating that on remand, if modification was granted, it would be retroactive only to the date of the judgment from which the appeal was taken).
¶ 42. In our prior opinion, we reversed and remanded to the chancery court for reconsideration of the modification issue. Under Setser, Cook, and Lane, the effective date of any modification granted on remand would have been the date of the judgment appealed from, which was May 19, 2003. But on remand, instead of reconsidering the modification issue based upon the evidence introduced in the prior proceedings, the chancellor heard new evidence pertaining to modification, including the opinions of Dr. Meyer and Dr. Farina. That evidence was not before the court on May 19, 2003. Therefore, any modification granted based upon the new evidence could not be made retroactive to May 19, 2003. The court entered its judgment on February 14, 2006, after considering the new evidence. Therefore, the effective date of any modification granted on remand will be February 14, 2006, presuming the chancellor does not hear more evidence.
¶ 43. Having found that, even if modification is granted on remand, Martin's support obligations will persist unchanged through February 14, 2006, we *978 proceed to review Martin's argument that the contempt finding was unsupported by the evidence. Contempt matters are committed to the substantial discretion of the trial court, though clear and convincing evidence is required. Cumberland, 564 So.2d at 845. We will not reverse the chancellor's finding of civil contempt absent manifest error or the application of an erroneous legal standard. Varner v. Varner, 666 So.2d 493, 496 (Miss.1995). This Court will not reverse when substantial evidence supports the chancellor's finding that payments could have been made. Howard, 913 So.2d at 1038(¶ 17) (citing Rainwater v. Rainwater, 236 Miss. 412, 421, 110 So.2d 608, 611 (1959)).
¶ 44. Our consideration of the contempt issue is limited to the chancellor's adjudication of the July 15, 2005 petition for citation of contempt. The chancellor found Martin to be in contempt because he continued his standard of living without providing his children with the court-ordered funds. The chancellor noted that Martin had continued to buy houses while claiming inability to pay and had most recently bought a house located on a golf course in Brandon, Mississippi. She also observed that Martin had contravened a court order requiring him to have a life insurance policy in favor of his children in the amount of $750,000. Martin testified that he cancelled that policy and bought a term life policy in the amount of $500,000 in favor of his current wife. The court also found that Martin had willfully reduced his income in an effort to avoid his obligations to his children by leaving the Pathology Lab and accepting a lower-paying job at UMMC. The court also found that, before and after the April 17, 2003 hearing, Martin had available funds of $78,000 from a cashed-in retirement account, a bank account in the amount of $100,000 shown on a loan application in 2000, approximately $28,000 received from cashing in the life insurance policy in 2001, and approximately $20,000 in returned premiums from his disability insurer.
¶ 45. Martin argues that he established that his noncompliance was not willful or contumacious because it was due to an inability to pay. "Inability to pay is a defense to a prima facie case of contempt." Howard, 913 So.2d at 1039(¶ 19) (citing Newell v. Hinton, 556 So.2d 1037, 1044 (Miss.1990)). Martin points to his testimony that he had no pension plan or retirement accounts, that there was no equity in his home, and that he had no other assets save a car with over 100,000 miles on it. He also cites his testimony that he sought the UMMC job because he was afraid of being fired by the Pathology Lab. Obviously, the chancellor viewed Martin's testimony about his motivations and his inability to pay with skepticism, and it is the chancellor's role to decide what weight to assign the testimony. Rogers, 791 So.2d at 826(¶ 39). We find that the evidence cited by the chancellor substantially supported her finding that Martin did not show inability to pay. The chancellor did not manifestly err by finding Martin to be in contempt.
IV. WHETHER THE CHANCELLOR ERRED BY AWARDING TERESA ATTORNEY'S FEES.
¶ 46. Martin contests the chancellor's award of attorney's fees of $19,213.17 to Teresa. The chancellor awarded this amount to Teresa upon a finding that Teresa was without sufficient funds to pay her attorney. The chancellor also found Teresa entitled to attorney's fees because of the contemptuous actions of Martin and because Teresa was forced to defend Martin's unsuccessful petition for modification of child support. Martin argues that the award was improper because *979 he was not in contempt and because the statement of attorney's fees submitted by Teresa was insufficiently definite to enable the chancellor's determination of the reasonableness of the fees pursuant to McKee v. McKee, 418 So.2d 764 (Miss. 1982).
¶ 47. The matter of attorney's fees in a divorce case is within the chancellor's sound discretion. McKee, 418 So.2d at 767. The appropriate amount of an attorney's fees award is that amount sufficient to secure the services of one competent attorney. McKee, 418 So.2d at 767. McKee articulated several factors to be considered in determining the amount of attorney's fees:
The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.
Id.
¶ 48. The chancellor awarded attorney's fees based in part on Teresa's successful prosecution of her petition for citation of contempt. A spouse who successfully prosecutes a petition for citation of contempt is entitled to attorney's fees. Lahmann v. Hallmon, 722 So.2d 614, 623(¶ 34) (Miss.1998). The purpose of an award of attorney's fees in a contempt action is to make the plaintiff whole. Bounds v. Bounds, 935 So.2d 407, 412(¶ 18) (Miss.Ct.App.2006). Establishment of the McKee factors is not necessary for an contemnee to recover attorney's fees where the contemnor has wilfully violated a lawful court order. Mixon v. Mixon, 724 So.2d 956, 964(¶ 29) (Miss.Ct.App. 1998). We have affirmed the chancellor's finding of contempt, and we likewise affirm the award of attorney's fees attributable to Teresa's prosecution of the contempt action.
¶ 49. The chancellor also awarded Teresa attorney's fees based on her inability to pay and the fact that she successfully defended Martin's petition for modification. The supreme court has held that attorney's fees in a modification case are not warranted unless the party requesting the fees is financially unable to pay them. Lahmann, 722 So.2d at 623(¶ 32). Teresa was not entitled to attorney's fees for winning the modification action, but only if she was financially unable to pay her attorney. Jones v. Jones, 917 So.2d 95, 104(¶ 29) (Miss.Ct.App.2005).
¶ 50. Though Martin does not contest the chancellor's finding that Teresa was unable to pay her attorney's fees, we observe that the record substantially supports the finding. Teresa makes eleven dollars per hour as a territory assistant for Hallmark Cards. A vocational report admitted into evidence showed that her annual income for the year 2004 at that job was $16,005, with a $6,000 mileage reimbursement. There was no evidence that she had any other assets from which to pay her attorney. Teresa testified that she could not pay her attorney and had depleted her personal resources by using them to support the children and to pay the $2510 per month house note because of Martin's continual failure to pay the sums ordered by the court. At one point, Teresa refinanced the house in order to use the equity to make the monthly mortgage payments. And, Teresa had previously testified that she had credit problems and could not qualify for a loan.
*980 ¶ 51. Martin's sole challenge to the chancellor's findings on the propriety of attorney's fees is his argument that the statement of Teresa's attorney contained insufficient detail to enable the court to determine what service was performed and whether the service was necessary and reasonable. The attorney's statement of services rendered listed descriptions of activities such as "work on case," "phone call," "prepare for depositions," and "review file" with a breakdown to the quarter-hour of the time expenditure for each activity, totaling 143.75 hours and $17,968.75. The statement also included the attorney's expenses of $1,244.42. The testimony was that the attorney's hourly rate of $125 per hour was $25 per hour less than he usually charged.
¶ 52. At the trial, Martin objected to the level of detail in the statement and Teresa's attorney offered to supply the court with a more detailed statement if requested. The chancellor informed Martin that she would consider his argument in deciding whether to award attorney's fees, but apparently rejected that argument by awarding the full amount of attorney's fees reflected by the statement. This Court has frowned upon time estimates as proof of expenditures and has indicated that an itemized account of fees is preferable. Turner v. Turner, 744 So.2d 332, 338(¶ 33) (Miss.Ct.App.1999); Grice v. Grice, 726 So.2d 1242, 1255(¶ 50) (Miss.Ct.App.1998). Teresa submitted an itemized statement of her attorney's time and work performed to the quarter-hour and we find that the chancellor was within her discretion in relying on this statement in awarding attorney's fees.
¶ 53. Finally, citing Grant v. Grant, 765 So.2d 1263 (Miss.2000), Teresa requests that this Court award her attorney's fees for defending the appeal in an amount equal to one-half of what was awarded by the chancery court. Teresa maintains that she is unable to pay her attorney's fees for handling the appeal. "[A]ttorney fees may be awarded on appeal and it [] is our established practice to award one half the amount awarded in the trial court." Durr v. Durr, 912 So.2d 1033, 1041(¶ 30) (Miss. Ct.App.2005). But ultimately, the decision whether to award attorney's fees on appeal is discretionary with this Court. Riddick v. Riddick, 906 So.2d 813, 829(¶ 52) (Miss. Ct.App.2004).
¶ 54. In this case, we believe that one-half of the $19,213.17 awarded below, or $9,606.59, is excessive for handling this appeal, and Teresa has submitted no evidence of the amounts actually expended. In determining that an appellee was not entitled to one-half the fees awarded below on appeal, the supreme court has stated, "`[t]he fee should be fair and should only compensate for services actually rendered after it has been determined that the legal work charged for was reasonably required and necessary.'" Monroe v. Monroe, 745 So.2d 249, 253(¶ 18) (Miss.1999) (quoting Creekmore v. Creekmore, 651 So.2d 513, 517 (Miss.1995)). In the absence of any evidence as to the amount of work involved, no attorney's fees were awarded in the Monroe case. Id. Moreover, Teresa is not fully successful in this appeal because we are remanding for reconsideration of the modification issue. For these reasons, we decline to award attorney's fees to Teresa on appeal.

CONCLUSION
¶ 55. We reverse and remand for the chancellor to reconsider the issue of modification of Martin's child support obligation. We affirm as to the finding of contempt. And, we affirm the award of attorney's fees to Teresa based on her inability to pay and her successful prosecution of the contempt action against Martin, *981 but decline to award Teresa attorney's fees on appeal.
¶ 56. THE JUDGMENT OF THE CHANCERY COURT OF PIKE COUNTY IS REVERSED AND REMANDED ON THE ISSUE OF MODIFICATION AND IS AFFIRMED ON THE ISSUES OF CONTEMPT AND ATTORNEY'S FEES. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY TO THE APPELLANT AND TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] We note that the opinion of the chancellor that is currently under review indicates that the November 2, 2001 letter opinion was made part of a final judgment dated December 3, 2001. These judgments are not in the record because Martin did not designate any part of the chancery court record from before our May 10, 2005 opinion. See Mississippi Rule of Appellate Procedure 10(b). In response to Teresa's argument that Martin failed to designate all necessary parts of the record, we find under the particular facts of this case that our May 10, 2005 opinion detailing the prior proceedings, along with the record after remand, fully enables appellate review.