CARLTON, J.,
dissenting:
¶21. I respectfully dissent from the majority’s decision because I would affirm the circuit court’s finding that the denial of duty-related retirement disability benefits was not based upon substantial evidence. Like the circuit court, I find that PERS’s denial of Comardelle’s benefits was arbitrary and lacked support by substantial credible evidence. I also respectfully submit that PERS’s decision was based upon speculation.
¶ 22. “Employees of the State of Mississippi are eligible for regular disability benefits and duty-related benefits.” Pub. Employees’ Ret. Sys. v. Trulove, 954 So.2d 501, 503 (¶ 11) (Miss.Ct.App.2007). To qualify for regular disability benefits, a claimant must possess at least four years of service. Miss.Code Ann. § 25-11-113(l)(a) (Supp.2014). In the present case, the record reflects that Comardelle possessed 5.25 years of service at the time she submitted her retirement application.
¶ 23. Section 25-ll-113(l)(a), which establishes the legal requirements for proving a disability, defines disability as follows:
*991 [T]he inability to perform the usual duties of employment or the incapacity to perform such lesser duties, if any, as the employer, in its discretion, may assign without material reduction in compensation, or the incapacity to perform the duties of any employment covered by the Public Employees’ Retirement System (Section 25-11-101 et seq.) that is actually offered and is within the same general territorial work area, without material reduction in compensation.
¶ 24. To qualify for duty-related disability benefits, a claimant bears the burden “to show that her disability is a direct result of an accident or traumatic event which occurred while she was performing her job duties.” Trulove, 954 So.2d at 503 (¶ 12) (citing Miss.Code Ann. § 25-11-114(6) (Supp.2014)). In pertinent part, section 25-11-114(6), provides:
Regardless of the number of years of creditable service, upon the application of a member or employer, any active member who becomes disabled as a direct result of an accident or traumatic event resulting in a physical injury occurring in the line of performance of duty, provided that the medical board or other designated governmental agency after a medical examination certifies that the member is mentally or physically incapacitated for the further performance of duty and the incapacity is likely to be permanent, may be retired by the board of trustees on the first of the month following the date of filing the application but in no event shall the retirement allowance begin before the termination of state service.
Our statutory law further provides that “[permanent and total disability resulting from a cardiovascular, pulmonary[,] or musculoskeletal condition that was not a direct result of a traumatic event occurring in the performance of duty shall be deemed an ordinary disability.” Miss. Code Ann. § 25-ll-114(7)(a) (Supp.2014).
¶25. To qualify for regular disability benefits, Comardelle only bore the burden to prove that she possessed at least four years of service and that she was no longer able to perform her duties as a teacher’s assistant. I find the record reflects that Comardelle met her burden under statutory law to qualify for regular disability benefits. In addition, the record shows that PERS’s decision denying Comardelle’s request for duty-related disability benefits was not supported by substantial evidence but was instead based on insufficient speculation.[1]
¶ 26. The record shows that Comardelle worked as a teacher’s assistant for the Pearl River County School District for over five years. Comardelle therefore satisfied the requirement for regular disability benefits regarding the duration of her employment. I now turn to a review of the evidence showing that Comardelle also satisfied her burden to prove a duty-related disability.[2]
¶ 27. The record contains the certification by Comardelle’s employer of her re *992 tirement-benefit application.[3] The record also contains Comardelle’s “First Report of Injury or Illness.” This form reflects that Comardelle notified her employer on October 7, 2003, the same date her injury occurred, that she slipped on the steps of the elementary-school campus and twisted her ankle. In addition to the “First Report of Injury or Illness,” the record also contains a “Pearl River County School District Employee Accident Report,” which certifies Comardelle’s work injury. As reflected in the record, this form is dated October 7, 2003, the same date as Comar-delle’s injury and bears the signature of Elaine Welsh, the principal of the elementary school where Comardelle worked.
¶ 28. The record also includes Comar-delle’s resignation form, which was signed by Comardelle, Welsh, and the school superintendent. The resignation application stated that Comardelle retired from her position as a teacher’s assistant due to her disability injury. In the attached “PERS Form 8,” which is a medical-information form, Comardelle further provided that her disability first prevented her from performing her job on May 19, 2008, and that her disability was as follows: “(RSD) Legs will not work[.]”[4] Comardelle explained on the form that she stopped working because of daily muscle spasms and pain and because her legs could not withstand the long hours on her feet. Comardelle further stated that her legs would stop working and would become painful and swollen. Comardelle also provided a summary of the physicians that had treated her in the past three to five years and the treatments she had received.
¶ 29. An application of relevant caselaw to the evidence in the record show that PERS’s decision was not supported by substantial evidence and that Comardelle indeed met her burden of proof. In Public Employees’ Retirement System v. Marquez, 774 So.2d 421, 427 (¶ 22) (Miss.2000), the Mississippi Supreme Court observed that medical diagnoses by licensed physicians constitute objective, rather than subjective, evidence of disability. The Marquez court found that PERS failed to adequately explain why it rejected objective medical evidence of the claimant’s disability. Id. at 429 (¶¶ 31-33).[5] In reaching its decision, the supreme court stated that, “[i]f medical diagnoses by licensed physicians are to be labeled ‘subjective’ evidence of medical ailments, it is unclear what PERS would consider to be ‘objective’ evidence.” Id. at 427 (¶ 22).
¶ 30. Like the claimant in Marquez, Comardelle provided recent medical evidence to establish that she was incapable of performing her duties as a teacher’s assistant. In finding that Comardelle met her burden of proof, I must acknowledge that jurisprudence establishes that substantial evidence means more than a mere scintilla or suspicion. See Henley v. Pub. Employees’ Ret. Sys. of Miss., 26 So.3d 1108, 1110 (¶ 13) (Miss.Ct.App.2010). Rather, the evidence must provide “an adequate basis of fact from which the fact in issue can be reasonably inferred.” Id. (citation omitted).
*993 ¶ 31. Substantial evidence that supports an agency’s decision is, “in fact, the absence of credible evidence presented on behalf of the party having the burden of proof on the issue that compels the denial of relief.” Id. (citation omitted). As previously discussed, PERS cannot simply choose to ignore uncontroverted evidence of a treating physician. See Pub. Employees’ Ret. Sys. v. Dearman, 846 So.2d 1014, 1018 (¶ 11) (Miss.2003). Cf. Pub. Employees’ Ret. Sys. v. McDonnell, 70 So.3d 264, 269-71 (¶¶ 13-15) (Miss.Ct.App.2011) (finding that PERS’s decision denying disability benefits lacked support by substantial evidence). In the present case, the record contains substantial objective medical evidence to support Comardelle’s disability.
¶ 32. Comardelle initially reported twisting her right ankle and experiencing foot pain on October 7, 2003, when she slipped at work. As stated, the record reflects that Comardelle’s employer certified both her accident report and her disability-retirement application. The record also reflects that Comardelle’s employer raised no dispute as to whether Comar-delle fell during the course and scope of her work. In addition, Comardelle’s employer failed to dispute Comardelle’s claimed work-related injury and disability.
¶ 33. The objective medical evidence in the record reflects that Comardelle met her burden to provide substantial evidence to support her disability retirement application and claim. As reflected in the record, Dr. Finger, Comardelle’s initial treating physician, found Comardelle’s x-rays to be normal and diagnosed Comardelle with an ankle sprain. After ordering an MRI, Dr. Finger made an objective finding that ComardeEe had a small cyst in the neck of the talus. When Comardelle returned to Dr. Finger on November 26, 2003, he reported that she presented with complaints of tenderness in her right ankle and numbness in her right foot. Although the NCS study returned normal results, Dr. Finger thought Comardelle might have flexor hal-lucis tendonitis and gave her a steroid injection.
¶ 34. On January 6, 2004, Dr. Melancon conducted an initial examination of Comar-delle due to her complaints of weakness, pain, and swelling in her right ankle. Dr. Melancon injected Comardelle with Lido-caine after finding that Comardelle presented with anterolateral capsulitis and tarsal tunnel syndrome. Tarsal tunnel syndrome results from an impingement or compression of the nerves going through the tarsal tunnel of the foot, which causes a painful foot condition and cuts off blood flow to the affected nerves.
¶ 35. On February 3, 2004, Comardelle underwent another MRI and returned to Dr. Melancon. The record reflects that Dr. Melancon opined that several areas of Comardelle’s ankle appeared suspicious for anterolateral dome lesion and possible internal derangement of the ankle joint. Based on his objective medical findings and diagnosis, Dr. Melancon recommended that Comardelle undergo tarsal tunnel surgery to release the nerves compressed in her ankle,
¶ 36. On February 20, 2004, Dr. Melan-con performed an ankle nerve repair surgery to release the compression of the nerves in the tarsal tunnel of Comardelle’s foot. Following the surgery, Comardelle’s pain continued, and Dr. Melancon eventually diagnosed her with RSD, which is a nerve disorder. See Neill v. Waterway Inc./Team Am., 994 So.2d 196, 198 (¶ 8) (Miss.Ct.App.2008) (noting that claimant’s physician found that claimant suffered from RSD, a nerve dysfunction, which caused claimant’s carpal tunnel pain); Howard v. Howard, 968 So.2d 961, 970-71 (¶¶ 16-18) (Miss.Ct.App.2007) (acknowledging evidence that husband’s RSD, *994 which was a nerve disorder, caused pain, sweating, loss of feeling, and numbness, and that the RSD resulted as a complication of the husband’s carpal tunnel release surgery).
¶ 37. On March 9, 2004, less than a month after her ankle nerve repair surgery, Comardelle presented to Forrest General Hospital’s emergency room with complaints of right lower leg pain and fever. The objective medical observations documented in the emergency-room physician’s records show that Comardelle suffered minimal swelling in her right calf, her surgical incision appeared inflamed, and her right lower extremity seemed cool to the touch. Comardelle also reported chronic decreased sensation in her lower right extremity. The emergency-room medical records revealed further objective medical evidence, including the fever, swelling, inflammation, and cool skin temperature that Comardelle experienced at the time. At a post-surgical follow-up appointment, Dr. Melancon observed that Comardelle’s scar was likely trying to contract, which caused her to walk improperly on the outside of her foot. Dr. Melancon further observed that walking on the outside of her foot caused Comardelle to experience pain in her right foot and ankle.
¶38. On November 1, 2004, another MRI was ordered. The results showed abnormal signal within the subcutaneous fat, which Comardelle’s doctor thought might represent an area of resolving he-matoma or cellulitis. On November 9, 2004, Comardelle reported severe nerve pain without swelling of her ankle. The record also reflects that the skin on Co-mardelle’s leg and foot had begun to peel. I submit that we must acknowledge that this evidence in Comardelle’s medical records regarding the abnormalities captured by the MRI and the peeling of Comar-delle’s skin add to the objective medical evidence supporting Comardelle’s claim. Following these developments, Dr, Melan-con stated his belief that Comardelle had early RSD.[6] He prescribed Comardelle Neurontin and referred her to Dr. Tarqui-nio.
¶ 39. On January 4, 2005, Dr. Melancon injected Comardelle’s right ankle with Li-docaine. On February 10, 2005, Comar-delle saw Dr. Tarquinio, who diagnosed her with CRPS.[7] For pain relief, Comar-delle began extensive physical therapy and underwent several lumbar sympathetic blocks. In 2006, Dr. Sitzman inserted Co-mardelle with a temporary electric nerve stimulator. Comardelle was able to stop taking narcotics for about a month because the stimulator alleviated her pain. However, the relief was temporary, and the pain returned after several months. Comar-delle also began experiencing pain in her left leg and hip, which Dr. Sitzman attributed to an exacerbation of Comardelle’s RSD. Dr. Sitzman later found that Comar-delle’s RSD, which had begun in her right ankle, had progressed to her left lower extremity as well.
¶ 40. The record reflects that Comar-delle reported the pain from her RSD continued to move up her right leg. The record also reflects that Comardelle presented with complaints of leg tremors, which she stated increased with normal activity such as walking, standing, or sitting for too long. Comardelle further complained that her legs would turn inward and her toes would curl upward. The record shows that Comardelle stated she wore high-topped tennis shoes, except when bathing, and that Dr. Melancon had *995 given her a boot to wear at night to help keep her legs straight. Comardelle also provided that, if her toes continued to curl upward, she would be unable to stand and might have to have her leg amputated. In addition, Comardelle stated that she used a wheelchair on a weekly basis.
¶41. Dr. Datz, a psychologist, diagnosed Comardelle with “Axis I—pain disorder with associated psychological factors and a general medical condition” and Axis III—CRPS. Comardelle returned to work after a six-week absence. She taught art until May 2008, when she quit due to the pain and her other symptoms. The record reflects Comardelle’s statement that she tried to use crutches at work but that her fingers would become cold when writing or typing.
¶42. On October 1, 2008, PERS requested that Dr. Collipp perform an IME on Comardelle. Dr. Collipp found that the results of Comardelle’s x-rays and MRIs were normal. Despite the prior diagnoses provided by Dr. Melancon, Dr. Sitzman, and Dr. Datz, and despite the objective medical findings documented in the record, Dr. Collipp found no objective basis for the CRPS diagnosis. He also opined that Co-mardelle lacked objective evidence of her subjective leg pain. On April 17, 2009, Dr. Summers also performed an IME on Co-mardelle. In contrast to Dr. Collipp, Dr. Summers did not exclude a diagnosis of RSD. Instead, Dr. Summers opined that he did not believe Comardelle suffered from RSD at the time of his exam, but he thought she might have had RSD in her right lower leg after her injury.
¶ 43. The record shows that, in denying Comardelle’s request for disability benefits, PERS and the Disability Appeals Committee asserted that Comardelle’s symptoms lacked visible and objective supporting evidence and that her symptoms appeared to result from somatization. However, PERS’s decision to deny Comardelle disability benefits failed to rebut or even address the objective medical evidence in the record that supported Co-mardelle’s injury and disability. PERS’s decision also disregarded the objective diagnoses made by Dr. Melancon, Dr. Sitz-man, and Dr. Datz.
¶ 44. After reviewing the record, I find that PERS and the Disability Appeals Committee denied Comardelle’s request for disability benefits based upon Dr. Col-lipp’s flawed diagnosis of somatization and the FCE asserting that Comardelle’s complaints of increased pain and shaking were attributable to somatization. In attributing Comardelle’s symptoms to soma-tization disorder, Dr. Collipp and Dr. Summers, who both performed IMEs on Comardelle, failed to exclude the diagnoses opined by Dr. Melancon, Dr. Sitz-man, and Dr. Datz that Comardelle’s increased pain and other symptoms stemmed from RSD etiology and the exacerbation of that condition.[8] Dr. Collipp and Dr. Summers also failed to follow the diagnostic criteria of somatic symptom disorder.[9]
¶ 45. In the present case, PERS’s decision lacked supporting credible evidence since PERS ignored the objective medical *996 evidence and diagnoses in the record from various treating physicians and instead relied on a diagnosis of a psychological condition that failed to exclude other etiologies for Comardelle’s complaints, as required by the pertinent diagnostic criteria. The record contains credible evidence to show that Comardelle suffered an accidental ankle injury at work, resulting in a painful foot condition, ankle nerve repair surgery, RSD, increased pain, and ultimately, her disabling condition. Moreover, the record reflects that Comardelle’s claim for duty-related disability benefits is supported by substantial credible evidence, including substantial objective medical evidence, of a resulting RSD diagnosis and increased pain due to exacerbation of the RSD.
¶ 46. Based on a review of the record, I respectfully find that the decision by PERS and the Disability Appeals Committee denying Comardelle’s claim for duty-related disability benefits was arbitrary and capricious and lacked support by substantial credible evidence in the record. I further submit that we should affirm the circuit court’s reversal of PERS’s decision.
LEE, C.J., AND IRVING, P.J., JOIN THIS OPINION.

. See generally Pub. Employees’ Ret. Sys. v. Finklea, 862 So.2d 569, 575 (¶ 23) (Miss.Ct.App.2004) (finding PERS’s denial of disability benefits arbitrary and capricious because the claimant presented substantial evidence to show her condition prevented her from performing the usual duties of her employment); Pub. Employees’ Ret. Sys. v. Thomas, 809 So.2d 690, 696 (¶ 23) (Miss.Ct.App.2001) (affirming the trial court’s reversal of PERS’s decision to deny disability benefits).

. See Trulove, 954 So.2d at 505 (¶ 16) (finding that the claimant satisfied her burden of establishing she was disabled by an on-the-job injury when she provided the Disability Appeals Committee with her medical records and her incident report).

. The record reflects that Elaine Welsh, the principal of the elementary school where Co-mardelle worked, certified the application.

. The record reflects that Dr. Melancon and Dr. Tarquinio diagnosed Comardelle with RSD, which is a nerve disorder where severe pain becomes widespread from the trauma site.

. See also Pub. Employees’ Ret. Sys. v. Dearman, 846 So.2d 1014, 1018 (¶ 11) (Miss.2003) (finding that the medical evidence of disability provided by the claimant’s examining physician was objective evidence and that the record was devoid of any evidence to show the claimant lacked a disability).

. As noted in the majority’s opinion, RSD refers to reflex sympathetic dystrophy.

. As noted in the majority’s opinion, CRPS refers to complex regional pain syndrome, which was formerly known as RSD.

. Dr. Datz, a psychologist, diagnosed Comar-delle with "Axis I—pain disorder with associated psychological factors and a general medical condition" and Axis III—CRPS. As previously stated, the record reflects that CRPS refers to complex regional pain syndrome and was formerly identified as RSD.

. The medical testimony supporting a diagnosis of somatoform disorder was provided when criteria from the previous edition of the Diagnostic and Statistical Manual of Mental Disorders, the DSM-IV, were relied upon. As explained by the DSM-V, the disorder was overdiagnosed due to an overemphasis of medically unexplained symptoms. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 309 (5th ed.2013). Furthermore, the DSM-V pro *996 vides that "[i]t is not appropriate to give an individual a mental disorder diagnosis solely because a medical cause cannot be demonstrated.” Id, However, even under the previous criteria used in the DSM-IV, a physician should first rule out general medical conditions and substance-induced etiologies for an individual’s claimed symptoms before reaching a diagnosis of somatoform disorder. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 485 (4th ed. text revision 2000). The DSM-V also provides that somatic symptoms may be concurrently associated with another medical condition. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 311 (5th ed.2013). For example, "an individual may become seriously disabled by symptoms of somatic symptom disorder after an uncomplicated myocardial infarction even if the myocardial infarction itself did not result in any disability.” Id. The DSM-V further explains that, when dealing with the related disorder of illness anxiety disorder, an "individual’s distress emanates not primarily from the physical complaint itself but rather from his or her anxiety about the meaning, significance, or cause of the complaint (i.e., the suspected medical diagnosis).” Id. at 315.